**In the Matter of the WELFARE OF A.D.**

No. C2–94–1676.

Supreme Court of Minnesota.

Aug. 4, 1995.

Robert M.A. Johnson, Anoka County Atty., Marcy S. Crain, M. Katherine Doty, Asst. County Attys., Anoka, for appellant.

Robert B. Varco, Berglund & Varco, Ltd., Anoka, for D.D.

Patricia Burchill, Asst. County Public Defender, Anoka, for Guardian ad Litem.

## OPINION

STRINGER, Justice.

On July 7, 1994, the Anoka County District Court terminated D.D.'s parental rights with respect to her natural daughter, A.D., pursuant to the grounds established in Minn.Stat. § 260.221, subd. 1(b)(4), (5), and (8) (1994). The court of appeals reversed. We granted the county's petition for further review to determine whether the trial court's decision to terminate D.D.'s parental rights was clearly erroneous. We reverse.

A.D. was born on December 20, 1989 at 29 weeks gestation, weighing 2 pounds, 14 ounces. She was discharged from the hospital's neonatal care unit on January 19, 1990, but readmitted approximately a week later with a respiratory infection. On February 12, 1990, D.D. apparently attempted to take the baby from the hospital; at that time a hospital social worker reported that D.D. was exhibiting "psychotic behavior" during the visit with the baby. A police hold was placed on the baby and D.D. was transported to the psychiatric unit at United Hospital. D.D. was subsequently committed to the Anoka Metro Regional Treatment Center (AMRTC).

On February 15, 1990, A.D. was released to her maternal grandmother, with whom D.D. lived. An Anoka County public health nurse twice contacted the grandmother to arrange home visits to monitor A.D.'s recovery, but the grandmother refused to permit public health officials to visit her home. D.D. was released from AMRTC on March 15, 1990.

During a visit to a WIC clinic to obtain supplies for the baby on March 21, 1990, WIC staff noticed that D.D. appeared ill, confused, and mentally unstable. They contacted police and D.D. was recommitted to AMRTC. A.D., then age three months, was removed from her mother's custody and placed in foster care where she remains to this day.

On July 17, 1990, on petition of the Anoka County Community Health and Social Services Department, A.D. was adjudicated a child in need of protection or services (CHIPS) pursuant to Minn.Stat. § 260.015, subd. 2a(8) (1994),[1] based on D.D.'s apparent mental illness. Although the psychotic behavior resulting in D.D.'s commitment has apparently resolved since her final discharge from AMRTC on July 13, 1990, at subsequent review hearings on the CHIPS finding, the court has continued A.D.'s CHIPS status.

In the two years following D.D.'s release from AMRTC, efforts to reunite D.D. and A.D. were unsuccessful. On or about May 14, 1992, the county filed its first petition for termination of D.D.'s parental rights. At the conclusion of the first phase of the ensuing trial, the court observed:

> Even though the evidence that came in was largely unfavorable to [D.D.], the

---

1. Minn.Stat. § 260.015, subd. 2a(8) (1994) provides that a " 'Child in need of protection or services' means a child who is in need of protection or services because the child * * * is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the child's parent, guardian, or other custodian."

court became impressed with [D.D.'s] fighting spirit. By the conclusion of the first phase testimony, the court believed that [D.D.] might be able to make good on one last opportunity to succeed if she were afforded the services of an attorney and a social worker in whom she had more confidence. Accordingly, after cautioning [D.D.] that the court had probably already heard clear and convincing evidence in support of termination, that it was time for her to make changes, and that she would have no more excuses if she failed to do so, the court ordered the trial recessed for a few months and it appointed [D.D.] a new family social worker and a new public defender.

A new social worker and attorney were thereupon appointed to serve D.D. The second phase of the earlier trial commenced in December 1992, and concluded on January 6, 1993.

On January 8, 1993, two days after the first termination trial concluded, D.D. gave birth to her second child, T.D.[2] About two weeks later, D.D., her social worker, and her guardian ad litem met to discuss support services for D.D., A.D., and the baby, pending receipt of the court's decision regarding the termination petition. D.D. would not permit anyone to visit her mother's house where she resided with T.D.

Throughout the entire course of events, D.D.'s residence with her mother was a concern to the county. A 1991 formal home study on the mother's residence documented repeated incidents of violence and chemical abuse in the home, and concluded that it was neither safe nor appropriate for A.D. Because D.D.'s family would not permit in-home services at their home, and because D.D. repeatedly declined the county's offers of shelter, transitional housing, or other services, in-home services could not be provided immediately. To address this issue, the county established a weekly supervised visitation schedule with visits between D.D. and A.D. to take place at the social worker's office, or at the Early Childhood Family Ed-

ucation Center (EFCE), a center offering parenting support and instruction.

After the first termination trial ended in January 1993, the record indicates that D.D.'s interest in or ability to maintain a consistent visitation schedule with A.D. substantially diminished. Of 13 potential visits scheduled during the period between January 20, 1993 and May 12, 1993, the date of the trial court's order, only six visits actually occurred. Two visits were cancelled by social services—because A.D. was sick, and because of poor road conditions. However, the other five visits did not occur because D.D. failed to show up, cancelled, rescheduled shortly before the visit, or failed to confirm the visit so that it had to be cancelled. The social worker testified that it was "disappointing" for A.D. to be transported to the center in expectation of a visit with her mother, only to have no visit occur.

In April 1993, Anoka County Financial Services informed D.D.'s social worker that D.D. had applied for emergency assistance to obtain alternate housing because her mother and brother had reportedly beaten her up. The financial services worker asked D.D. if she had contacted police, and D.D. allegedly yelled at the financial services worker that she couldn't contact police because of the pending termination petition. D.D. ultimately left the financial services office, saying that it would be the emergency assistance worker's fault if T.D. had to live in D.D.'s car or if D.D. had to return to her mother's residence. Social services offered to arrange alternate housing arrangements for D.D. and T.D., but D.D. chose to return to her mother's home.

The trial court issued its order denying the county's termination petition on May 12, 1993. The court found that the "condition which prompted the filing of the CHIPS petition in March 1990—[D.D.'s] mental illness—no longer exists" and ordered social services to prepare a placement plan providing for increased visitation and efforts toward reunification with A.D.

---

**2.** T.D. resides with her mother, and apparently no action has been taken to remove T.D. from D.D.'s custody.

Accordingly, on May 26, 1993, D.D.'s social worker met with D.D. and her guardian ad litem to discuss implementation of the judge's recommendation for increased access to A.D., and for institution of in-home services as recommended by the court.[3] Consistent with the trial court's order, D.D.'s social worker proposed the Freeport West program, an intensive in-home parenting program that would provide D.D. with greater access to A.D., supervised visitation, and parenting instruction. According to the social worker, the Freeport West program is frequently used to avoid out-of-home placement or to expedite a child's return home.

At the time, D.D. still resided with her mother. Because the family would not allow Freeport West to provide in-home services at their residence, and D.D. refused transitional and subsidized housing alternatives that would have enabled her to commence the Freeport West program more quickly, social services and D.D. agreed upon a weekly supervised visitation schedule.

Despite the social workers' efforts to accommodate D.D.'s refusal to permit in-home visitation or housing services, of seven visits scheduled between late May and August 1993, only four occurred. Of those four visits, D.D. arrived late or left early on two occasions, and one visit lasted only a "couple of minutes" because of a conflict about where the visit would take place and whether D.D.'s father could participate in the visit.[4] D.D. cancelled the visit scheduled for July 2, 1993. On July 6, 1993, A.D. was transported for a scheduled visit but D.D. arrived late and the visit did not occur. On July 20, 1993, D.D. and the social worker jointly agreed to cancel the scheduled visit because D.D. was under considerable stress—she told the social worker that she feared she might be pregnant, and that she had been beaten by her sister's boyfriend. D.D. declined the social worker's offer to relocate D.D. to a shelter for battered women.

On August 1, 1993, D.D. moved into her own apartment, enabling commencement of the Freeport West program—the program recommended four months earlier as providing D.D. with the most expeditious plan for reuniting with A.D. At a review hearing on the CHIPS petition on August 12 the court adopted a case plan wherein D.D. would participate in in-home services and establish a "safe and appropriate" residence free of "chemicals, chaos, illegal activity, or violence." Under the terms of the plan, on a weekly basis D.D. would attend parenting and other support classes in the morning, and spend the afternoon at her home with A.D. Essentially, the in-home service program enabled D.D. to increase her visitation with A.D. from two hours per week to nearly one full day of visitation per week. The in-home visits were supervised by Freeport West staff.

Despite the opportunities presented by the plan for reuniting with A.D., D.D.'s record of keeping her visitation appointments with her daughter, A.D., continued to deteriorate. Of 16 scheduled visits between September 13, 1993 and December 23, 1993, only six occurred, and of the six visits that did occur, two ended early.[5]

D.D. cancelled the first scheduled visit because T.D. was sick, and the next scheduled visit ended early because D.D. became sick. On September 20, the social worker took A.D. to D.D.'s apartment at 11:30 a.m., as scheduled, but no one answered the door. D.D. later told the social worker that she had in fact been home, but had fallen asleep and did not hear the door's buzzer. The visit scheduled for September 27 did not occur because D.D. failed to confirm it.

On October 15, when the social worker arrived with A.D. for a scheduled visit, a man

---

3. At the meeting D.D. disclosed that she had recently visited the Mercy Crisis Unit, where she was referred for individual psychological counseling. She apparently attended one meeting with a therapist but declined to return for additional counseling. She also disclosed legal difficulties allegedly stemming from writing bad checks.

4. In connection with this incident, D.D. threatened to remove A.D. from her foster home and physically threatened social service workers.

5. The visits scheduled for October 4 and October 11 were cancelled by social services because of a transportation problem and a scheduling conflict.

was sleeping on D.D.'s couch, and D.D. was in bed sleeping. The social worker asked the man to leave, D.D. got up, and the scheduled visit proceeded. On October 18, Freeport West supervised a visit that went well. On October 25, the scheduled visit began well, but D.D. began to "fade out" by the afternoon, apparently falling asleep. D.D. did not hear the Freeport West staff person speak to her and did not hear the baby, T.D., when the baby awoke from her nap.

On November 1, when the social worker arrived with A.D., D.D. was "visibly agitated." The social worker asked D.D. why she was so agitated and D.D. responded "[a]ll I can tell you is that my life is in danger." That day, D.D. attended her second and last class at EFCE. After the class D.D. refused to return to EFCE, apparently because she was angry about the Center's request for the childrens' immunization records. Freeport Staff ended the afternoon visit with A.D. early because D.D. became ill. At trial, the social worker testified: "[a]t one point when [D.D.] was rolling on the floor and grabbing her stomach, [A.D.] asked * * * "Why is my mom dying?"

Finally, on November 3, when Freeport West staff contacted D.D. about further visitation, D.D. simply refused further services altogether. D.D. missed the next five scheduled visits with A.D. D.D. last visited A.D. on December 23, 1993.

D.D. agreed to meet with the social worker to discuss reestablishing a visitation plan on January 20, 1994, but at the meeting, D.D. became angry because the social worker brought A.D.'s guardian-ad-litem without first informing D.D. The meeting ended unfruitfully after about 20 minutes.

The County filed a second petition for termination of D.D.'s parental rights pursuant to Minn.Stat. § 260.221, subd. 1(b)(4), (5) (1994) on March 3, 1994. At the commencement of the termination trial on June 6, 1994, the court granted the County's motion to amend the petition to include another claim under Minn.Stat. § 260.221, subd. 1(b)(8) (1994), as an additional ground for termination.

At the second trial, the County indicated that while there is no evidence D.D. is physically abusive toward A.D., and that indeed, during most of her visits with A.D. that did occur D.D. exhibited appropriate behavior toward A.D., nonetheless, both A.D.'s guardian-ad-litem and D.D.'s social worker testified that they supported terminating D.D.'s parental rights. D.D.'s social worker opined that while D.D. has shown she can play with A.D. on a short-term basis, she has not shown she can care for A.D. full-time. Moreover, according to the social worker, D.D. has consistently "displayed a volatile, threatening, aggressive manner that [the social worker] think[s] is physically intimidating to this child as evidenced by her reactions to the extended visitation, and that it puts the child in a position where she is fearful." The social workers involved in trying to facilitate the reunification of D.D. and A.D. concluded that reunification was unlikely to occur in the foreseeable future.

■■■ There is perhaps no more grave matter that comes before the court than the termination of a parent's relationship with a child. For this reason, we exercise "great caution in [parental] termination proceedings, finding such action proper only when the evidence clearly mandates such a result in accordance with the statutory grounds." *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978); *see also In re Welfare of Solomon,* 291 N.W.2d 364, 367 (Minn.1980). Our caution in these matters stems in part from the presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child. *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). Ordinarily, it is in the best interest of a child to be in the custody of his or her natural parents. *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn.1980).

■■■ Thus, an order terminating parental rights is appropriate only if it appears that the condition of dependency or neglect will continue for a prolonged, indefinite period of time, and such an order must be supported by clear and convincing evidence. *In re Welfare of Rosenbloom,* 266 N.W.2d 888, 889 (Minn.1978); *In re Welfare of Barron,* 268 Minn. 48, 53, 127 N.W.2d 702, 706 (1964).

However, parents' right to custody exists "only so long as they shall promptly recognize and discharge their corresponding obligations." *In re Welfare of H.G.B.*, 306 N.W.2d 821, 825 (Minn.1981). In determining whether termination of parental rights is appropriate, the best interest of the child is the paramount consideration. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279 (Minn.1986).

▆▆▆ Trial courts "stand in a superior position to appellate courts in assessing the credibility of witnesses * * *." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 374–75 (Minn.1990). This is particularly true in the context of a case such as this, where the trial court's opportunity to observe the parent and other witnesses who are called to testify is so crucial to an accurate evaluation of what is best for the child. Accordingly, on appeal in a termination of parental rights case, while we carefully review the record, we will not overturn the trial court's findings of fact unless those findings are clearly erroneous. *In re Welfare of Solomon*, 291 N.W.2d at 367; *see also In re Welfare of M.D.O.*, 462 N.W.2d at 375.

Minn.Stat. § 260.221, subd. 1(b)(8) permits the termination of parental rights when a child is "neglected and in foster care." The legislature defines the phrase "neglected and in foster care" to mean a child:

(a) Who has been placed in foster care by court order; and

(b) Whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and

(c) Whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn.Stat. § 260.015, subd 18 (1994); *see also* Act of Mar. 28, 1978, ch. 602, 1978 Minn.Laws 368 (amending parental termination statute to add neglect as grounds for termination of parental rights); *In re Welfare of H.G.B.*, 306 N.W.2d 821, 826 (Minn. 1981) (discussing statutory amendments).

In addition, the legislature has outlined specific factors the courts should consider in determining whether a child is "neglected and in foster care":

(1) the length of time the child has been in foster care;

(2) the effort the parent has made to adjust circumstances, conduct, or condition that necessitates the removal of the child to make it in the child's best interest to be returned to the parent's home in the foreseeable future, including the use of rehabilitative services offered to the parent;

(3) whether the parent has visited the child within the three months preceding the filing of the petition, unless extreme financial or physical hardship or treatment for mental disability or chemical dependency or other good cause prevented the parent from visiting the child or it was not in the best interest of the child to be visited by the parent;

(4) the maintenance of regular contact or communication with the agency or person temporarily responsible for the child;

(5) the appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;

(6) whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time, whether the services have been offered to the parent, or, if services were not offered, the reasons they were not offered; and

(7) the nature of the efforts made by the responsible social service agency to rehabilitate and reunite the family, and whether the efforts were reasonable.

Minn.Stat. § 260.155, subd. 7 (1994).

The trial court concluded that A.D. is "neglected and in foster care." The court of appeals reversed, noting that in the order denying the initial termination petition, the court found no evidence of neglect, and that D.D.'s psychotic behavior that prompted the initial CHIPS finding had resolved. We reverse.

▆▆▆ While the trial court did not support its conclusion that A.D. is neglected and in

foster care with specific reference to each of the factors outlined in Minn.Stat. § 260.155, subd. 7, the court's detailed findings of fact demonstrate the existence of many of the factors outlined in the statute, and provide clear and convincing evidence of the standard for termination articulated in Minn.Stat. § 260.221, subd. 1(b)(8), and defined in Minn. Stat. § 260.015, subd. 18. Having carefully reviewed the record, guided by the factors established by the legislature pursuant to Minn.Stat. § 260.155, subd. 7, we conclude that the trial court's factual findings support its determination that A.D. is neglected and in foster care, and that there is little prospect of improvement.

At the time of the second termination trial, A.D., had been in foster care for over four years, since the age of three months. *See* Minn.Stat. § 260.155, subd. 7(1). At trial, the County documented the extensive rehabilitative services offered D.D. The trial court specifically noted in its findings of fact that D.D. had repeatedly refused many, if not most of those services—notably, housing and mental health services. *See* Minn.Stat. § 260.155, subd. 7(2) & (7). The trial court documented D.D.'s erratic visitation record; indeed, D.D. visited A.D. only once in the three months preceding the filing of the petition—in December 1993. *See* Minn.Stat. § 260.155, subd. 7(3). Moreover, as the trial court noted, "[a]t no time since January of 1993 has [D.D.] * * * made a request for services which was denied by [the social worker]." *See* Minn.Stat. § 260.155, subd. 7(5). The trial court also noted D.D.'s conflicts with the County, and her frequent failure to make scheduled visits to see A.D. *See* Minn.Stat. § 260.155, subd. 7(4). In addition, D.D.'s social worker testified that she refused D.D.'s requests for unsupervised visitation because of D.D.'s "volatile, threatening, aggressive manner that [the social worker] think[s] is physically intimidating to [A.D.] as evidenced by her reactions to the extended visitation, and that it puts the child in a position where she is fearful."

We conclude that the trial court properly addressed the relevant statutory criteria. Indeed, the court made factual findings on virtually every one of the factors outlined in Minn.Stat. § 260.155, subd. 7, and our careful review of the record indicates that those factual findings are supported by clear and convincing evidence. *See In re Welfare of M.D.O.,* 462 N.W.2d at 375.

 We recognize that a sporadic visitation history alone will not support termination of a parent's rights. *In re Welfare of Solomon,* 291 N.W.2d at 368. In a termination case, the court "relies not primarily on past history, but 'to a great extent upon the projected permanency of the parent's inability to care for his or her child.'" *Id.* (quoting *In re Welfare of Kidd,* 261 N.W.2d 833, 836 (Minn.1978)). Thus, we consider whether the inability to care for the child will continue indefinitely. *See id.*

D.D.'s social worker testified "It's my belief that there is no foreseeable time when that [providing parenting] could happen, right. I don't see a point where she could do that for [A.D.]." The social worker also indicated that in her 11 years of experience, never before had a parent opted for no visitation rather than supervised visitation. The trial court explicitly concluded that "[g]iven [D.D.'s] refusal to participate in supervised visitation and her refusal to utilize in-home services, the Court can only conclude that no reunification will occur within the foreseeable future."

It is undisputed that A.D. was placed and remains in foster care by court order. *See* Minn.Stat. § 260.015, subd. 18(a). Regardless of whether the resolution of D.D.'s psychosis means the conditions leading to the CHIPS petition have resolved,[6] D.D.'s appar-

---

**6.** According to the court of appeals, the trial court erred in concluding that "reasonable efforts * * * have failed to correct the conditions leading to the [CHIPS] determination" because the psychotic behavior that prompted the initial CHIPS finding has apparently resolved, and no subsequent CHIPS petition has been filed. *See* Minn.Stat. § 260.221, subd. 1(b)(5). We dis-

agree. As the trial court noted, the Anoka County District Court found A.D. in continued need of protection or services at repeated review hearings on the CHIPS finding, including a review hearing held after the court filed its order denying the first termination petition. Nothing in the record before us suggests that the finding that

ent inability or unwillingness to establish a consistent visitation record with her daughter supports the trial court's conclusion that D.D.'s "circumstances, condition, or conduct are such" that A.D. cannot be returned to her. *See* Minn.Stat. § 260.015, subd. 18(b).

Mindful of the seriousness of parental termination cases, we believe this result is consistent with our established policy of considering the best interests of the child.

> [W]here * * * the record demonstrates a long-term placement characterized by a repeated failure of reasonable efforts to reunite the family, the trial court should appropriately determine what action most readily promotes the best interests of the child. While judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.

*In re Welfare of J.J.B.*, 390 N.W.2d at 280. In the five years A.D. has been in foster care, D.D. has failed to meet even the most minimal expectations with regard to visiting her daughter, and the evidence supports the trial court's conclusion that reunification is unlikely in the foreseeable future. While we do not question D.D.'s love for the child, or her apparent desire to regain custody, here, parental rights must yield to the best interest of the child. The trial court concluded that it would be in the best interest of the child to terminate parental rights so that A.D. can be placed for adoption and provided with a permanent, stable home environment, and we agree.

We hold that the trial court's conclusion that the county established by clear and convincing evidence the necessary criteria pursuant to Minn.Stat. § 260.221, subd. 1(b)(8), was not clearly erroneous.

■ The court need find only one of the statutory grounds articulated in Minn.Stat. § 260.221, subd. 1(b) in order to terminate a parent's rights. *In re Welfare of R.M.M.*, 316 N.W.2d 538, 541 (Minn.1982). Accordingly, we need not address the remaining grounds for termination considered by the trial court.

A.D. was in need of protection or services was erroneous.

The decision of the court of appeals is reversed and the order terminating parental rights is reinstated.