In the Matter of the WELFARE
OF P.R.L.

No. C4–99–1214.

Supreme Court of Minnesota.

Feb. 22, 2001.

Amy Klobuchar, Hennepin County Attorney, Andrew J. Mitchell, Asst. County Atty., Minneapolis, for Appellants.

Warren R. Sagstuen, Assistant Public Defender, Minneapolis, for Respondents.

Gerald Chester, Minneapolis, for Guardian Ad Litem.

## OPINION

LANCASTER, Justice.

This case arose from a petition by the appellant, Hennepin County Department of Children and Family Services (DCFS), to the Hennepin County District Court, requesting termination of respondent mother's parental rights to her child, P.R.L. P.R.L. was born in July 1988. He has been consistently adjudicated a child in need of protection or services since November 1996 and has been placed out of his mother's home continuously since June 1996. In April 1998, pursuant to an agreement by the parties, the district court issued an order that terminated respondent's parental rights to P.R.L. but also stayed the termination. In June 1999, the district court revoked the stay and terminated respondent's parental rights. Respondent appealed the revocation and the court of appeals concluded that the district court orders did not contain findings of fact demonstrating that there was, in June 1999, an existing cause for termination. The court of appeals reversed and remanded the case to the district court for further findings and DCFS requested review by this court. Because we conclude that the June 1999 district court order contains findings sufficient to show an existing cause for termination, we reverse the court of appeals and reinstate the judgment of the district court.

The respondent in this case is the mother of three children, the youngest of whom, 12 year old P.R.L., is the subject of this case. Respondent was married to the children's father[1] from 1984 until 1990 and she was granted custody of the children upon dissolution of her marriage to their father.

---

1. The record indicates that the father was not involved with his children following the divorce, but he apparently became re-associated with them as a result of the 1994 filings in this matter, at which time the county encouraged visitation in the hopes of reunification of the children with their father. These attempts failed and the father's parental rights as to P.R.L. were eventually terminated. There is no record of an appeal by him, and that judgment is not at issue in this appeal.

The children's case file with Hennepin County Child Protection Services extends back to 1991, when Child Protection Services received and substantiated a report that the children were neglected. P.R.L. was then two years old. That case was closed a month later after respondent agreed to a safety plan for the children that included parenting education for herself, adequate supervision of the children and decreased physical discipline. In 1993, Child Protection Services received and substantiated several reports concerning physical abuse of the children by both respondent and her boyfriend, Willie Richardson. The case was closed in November of that year, after respondent participated in chemical abuse and parenting programs.

Two months later, on January 17, 1994, Richardson assaulted respondent by punching and kicking her and hitting her with a cooking pot. He then took a knife into a room where the children were and threatened them, saying: "I'm going to take care of you all." Respondent fled the home to call the police. On February 1, Child Protection Services spoke with one of the children and learned that Richardson was presently residing in the home, had assaulted respondent prior to the January 17 incident, and regularly hit the children with a belt. The child feared physical retribution from his mother for talking with Child Protection Services. Respondent denied to a social worker that Richardson was living in the home but admitted that he had physically assaulted her in the past. A social worker called respondent's residence on February 4 and Richardson answered the phone. When respondent got on the phone, she told the social worker that she would not file for a protective order against Richardson. Child Protection Services filed a petition requesting a finding by the court that the children were in need of protective services. The children were removed from respondent's home and, after a hearing on February 11, the district court gave temporary custody of the children to DCFS. In late February, respondent finally obtained a protective order against Richardson and the children were returned to her on March 28, 1994. A trial was scheduled for June.

Before the trial took place, the parties reached a settlement agreement and the district court issued an order pursuant to that agreement, adjudging the children to be in need of protection and services and placing them under protective supervision but allowing them to live with their mother. The court ordered respondent to attend domestic abuse and parenting programs, and to enforce the February protection order against Richardson. Richardson was to have no contact with the children until he completed domestic abuse and chemical dependency programs. DCFS closed the case in September 1995.

In January 1996, DCFS reopened the case upon learning that respondent had resumed her relationship with Richardson and had, in December 1995, fired a gun at Richardson while the children were in the home. Respondent again refused to get a protective order against Richardson. In June 1996, DCFS filed a petition requesting an order for immediate custody. The petition reported, along with the facts already mentioned, that respondent had told a DCFS social worker that she would not leave Richardson and that respondent had left her children with her sister, saying that she did not want them back. The district court authorized the removal of all three children from respondent's home.

After a November 1996 hearing, the district court concluded that the children were in need of protection or services based on findings that respondent had visited her children infrequently, had maintained only minimal contact with the assigned child protection worker, and had not substantially complied with her previous case plan because she had not obtained a protective order against Richardson. The court found that continuing placement outside the home was in the best interests

of the children and issued an order that continued their out-of-home placement and transferred legal custody of the children to DCFS. The court also ordered respondent to complete a case plan that required her to obtain a protective order against Richardson and prevent contact between him and the children, complete parenting and domestic abuse programs, and maintain regular contact with her children and their assigned child protection worker. The court continued the matter and gave notice that a hearing to determine the permanent status of the children was to be held by June 1997.

At hearings in January and April of 1997, the district court found that respondent was not following her case plan and DCFS filed a motion to place all of the children in long-term foster care. Clinical psychologists who met with the children recommended that the siblings be separated due to their negative interactions; the two older children were subsequently placed in separate group foster homes. Because he was not yet 12 years old, P.R.L. was ineligible for long-term foster care unless he was placed with a sibling. Minn.Stat. § 260C.201, subd. 11(e)(3) (2000).

In January 1998, DCFS petitioned the district court to terminate the parental rights of respondent as to P.R.L.[2] and a permanency hearing was scheduled for March 25, 1998. Prior to the hearing, respondent and DCFS entered into a stipulation that was reduced to writing in the court's April 1998 Stayed Findings of Fact, Conclusions of Law and Order for Termination of Parental Rights (Stayed Order). The court found that respondent continued to have contact with Richardson throughout 1997, and possibly more recently, but that respondent also had complied with other provisions of her case plan by maintaining regular contact with P.R.L. and his

child protection worker and by nearing completion of parenting and domestic abuse programs. The court concluded that there was clear and convincing evidence that it was in the best interests of the child to terminate respondent's parental rights to P.R.L., and also that there was clear and convincing evidence that it was in the best interests of the child to stay the entry of the termination order for a period of time.

The Stayed Order was subject to several conditions, one being that respondent was not to have consensual contact with Richardson and was to enforce the protective order previously issued against him. The Stayed Order added that termination would be entered automatically in 90 days unless, in the intervening time, the district court ordered entry of the termination order upon motion, dismissed the proceedings upon motion, or extended the Stayed Order for an additional successive period of up to 90 days.[3] Any motion for alternative permanency was to result in a hearing limited to the sole issue of whether the proposed alternative permanency option was in the child's best interests compared to entry of the termination order.

In June 1998, DCFS became aware that respondent again was involved with Richardson and moved the district court to revoke the stay and enter an order terminating respondent's parental rights. At a hearing on that motion, respondent admitted contact with Richardson and waived her right to an evidentiary hearing on the issue. Respondent also indicated an understanding that her admission required the court to enter the termination order unless the court was convinced that long-term foster care could be arranged for P.R.L. and that such a permanency arrangement was in the best interests of the

---

2. The two older children were not included in this petition as they were subjects of a motion for permanent placement in long-term foster care, which was granted in February 1998.

3. If the stay was extended, the termination order was to be entered automatically after 180 days, unless otherwise ordered after motion or stipulation by the parties.

child.[4]

The district court declined to vacate the stay immediately, preferring instead to meet further with the parties and therapists to discuss P.R.L.'s best interests. In September, the court requested that DCFS look for a foster home that could accommodate both P.R.L. and his older brother, as P.R.L. was still too young for individual placement in long-term foster care.

In November 1998, respondent filed a motion to be reunified with P.R.L. She acknowledged that her contact with Richardson violated a condition of the stay, but claimed that new information showed that condition to be unreasonable. Respondent stated that at the time the district court made her non-contact with Richardson a condition of the Stayed Order, the court was unaware that Richardson was completing a domestic abuse program as part of a separate child protection case plan involving his own child. Respondent claimed that the Stayed Order's condition that she avoid contact with Richardson was based on a belief that Richardson had made no arrangements to remedy his abusive relationship with her. Respondent argued that this new information showed that the no-contact condition was unreasonable and the motion to vacate the stay, based upon her violation of an unreasonable condition, should be denied.

In April and June of 1999, the district court held hearings on the matter and issued a June 1999 order that denied respondent's motion to reunify and lifted the stay of the termination of respondent's parental rights. The court incorporated into its findings the findings from the April 1998 Stayed Order (which in turn incorporated the 1994 and 1996 court orders) that for several years and despite court orders to the contrary, respondent had main-tained an ongoing relationship with Richardson during which she was physically abused in the presence of the children. In addition, the court found that: (1) respondent had violated the conditions of the stay by having consensual contact with Richardson; (2) the court in Richardson's child protection case (the case plan for which formed the basis of respondent's claim that the no-contact condition was unreasonable) had allowed Richardson unsupervised visits with his child only so long as Richardson was not in the company of respondent; and (3) because P.R.L. was still not yet 12 years old and no long-term foster care could be found for P.R.L. together with his older brother, long-term foster care was not a possible permanency arrangement. The court concluded that there was clear and convincing evidence that terminating respondent's parental rights was in the best interests of P.R.L. because: respondent had substantially, continuously or repeatedly refused or neglected to comply with the duties imposed upon her by the parent-child relationship, *see* Minn.Stat. § 260C.301, subd. 1(b)(2) (2000); respondent was palpably unfit to be a party to the parent-child relationship, *see id.* subd. 1(b)(4) (2000); after P.R.L. had been determined to be a child in need of protection or services, reasonable efforts failed to correct the conditions that led to that determination, *see id.* subd. 1(b)(5) (2000); and P.R.L. was neglected and in foster care, *see id.* subd. 1(b)(8) (2000).

On appeal, the court of appeals determined that the district court did not make specific factual findings concerning current conditions sufficient to show by clear and convincing evidence that a statutory condition justifying termination was satisfied at the time the stay was lifted, as required by *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). *In re Welfare of P.R.L.,* 606 N.W.2d 72, 75 (Minn.App.2000). In

---

4. After the respondent indicated her understanding, the court further inquired: "You understand that what's going to happen next is I'm going to enter some form of permanency order that there is going to be a termi-nation of parental rights as to [P.R.L.] or some other form of permanency that will be on a motion filed after a hearing, right?" Respondent answered, "Yes, I understand."

addition, the court of appeals noted that the district court order did not address the requirement that the petitioning party prove that a consistent pattern of specific conduct or specific conditions detrimental to the child existed at the time of the hearing and apparently would continue for a prolonged, indefinite period, as required by *In re Welfare of M.D.O.*, 462 N.W.2d 370, 377 (Minn.1990). *P.R.L.*, 606 N.W.2d at 76. Because it found the record inadequate to support termination of respondent's parental rights, the court of appeals reversed the termination and remanded for an evidentiary hearing.

We review terminations of parental rights to determine whether the district court's findings address the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous. *M.D.O.*, 462 N.W.2d at 375. We study the record carefully to determine whether the evidence is clear and convincing. *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980).

In a termination of parental rights proceeding, the best interests of the child must always be the chief consideration. Minn.Stat. § 260C.301, subd. 7 (2000); *In re Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn.1995); *M.D.O.*, 462 N.W.2d at 375. In most cases, it is presumed that the child's best interests are served by being with a parent. *A.D.*, 535 N.W.2d at

647. To terminate a person's parental rights, the district court must find clear and convincing evidence that statutory requirements are met. Minn. R. Juv. P. 59.05 (1999).[5] This evidence must relate to conditions that exist at the time of termination and it must appear that the conditions giving rise to the termination will continue for a prolonged, indeterminate period. *Chosa*, 290 N.W.2d at 769.

Here the district court terminated parental rights twice; once in April of 1998 and again (finally) in June of 1999. The 1998 order was, as we have already observed, "stayed," with entry to be automatic after 90 days (with possible extension to 180 days) or possibly on request of the county after demonstrated violation by the parent of conditions of the stay, unless the proceedings were dismissed in the interim.

Staying a permanency order is a settlement tool that finds no specific authority in statute or rule. The DCFS acknowledged in its brief to this court the lack of specific authority for staying permanency orders, but it appears that both parties in this case assume stayed orders of termination are allowed in settlement agreements between the parties under Minn. R. Juv. P. 56 (1999).[6] We recognize that a stay of entry of a termination order is probably an expedient settlement tool and this is not the first time we have seen

5. The Juvenile Protection Rules of the Minnesota Rules of Juvenile Procedure were amended by order, with the new rules effective March 1, 2000. Order Modifying Effective Date of Juvenile Protection Rules, C4–97–1693 (Minn. Dec. 29, 1999). The case at hand was litigated under the old rules, and for that reason we cite to the rules effective in 1999.

6. Minnesota Rules of Juvenile Procedure 56 (1999) provides for and lays out the procedure that a juvenile court must follow with regard to settlement agreements. It is possible that courts base stayed termination orders on the 1999 Minnesota Rules of Juvenile Procedure, under which, "after terminating parental rights, pursuant to Rule 61, the court may conduct a disposition hearing immedi-

ately or continue the matter for a disposition hearing at a later time." *Id.* 62.01 (1999). Rule 61.02 of the 1999 Rules provided that where a petition alleged dependency, neglect, or neglected and in foster care, an adjudication could be withheld for a period of 90 days from a finding that the allegations were proved, and that the court could extend the withholding for an additional successive period not to exceed 90 days. *Id.* 61.02 (1999); *see id.* 61.01 (1999). This does not authorize a lengthy stay of a termination of parental rights order. Nor do the new Juvenile Protection Rules, which apply to all matters filed on or after March 1, 2000, provide for stayed terminations of parental rights. Minn. R. Juv. P. 37.82 (2000).

it used,[7] but settlement tools in child protection matters cannot exist outside the statutory mandate that decisions are to serve a child's best interests. We cannot ignore the fact that this practice favors appeasement of parents and legal practitioners interested in disposing of cases but does little or nothing to promote the best interests of children. The factual framework of this case presents an object lesson in the difficulties created by staying termination orders—difficulties that go beyond the lack of authority for the practice.

Given the high standard necessary to justify a termination, it requires strained reasoning to justify a stay. The illogic is demonstrated by the two conclusions of law in the April 1998 Stayed Order in this case:

1.0 There is clear and convincing evidence that it is in the best interests of the child that parental rights of [respondent mother] be terminated.

2.0 There is clear and convincing evidence that it is in the best interests of the child to stay the entry of this Order, as to [respondent mother], for a period of time.

■ A stayed termination order engenders in child and parent the hope of reunification based upon anticipated compliance with the conditions of the stay by a parent who has so steadfastly failed to comply with case plans that it has been found to be in the best interests of the child to have the parent's rights terminated. In that way it exacts real, human costs. It is particularly troubling to stay entry of a permanency order in the factual framework of this case, where the problem that led to termination was one of such long standing and the prospects of success during a stay so dim as to make the court, through its agreement to the stay, a party to fruitless delay. While the courts must exhibit caution in severing family bonds,

they should not merely delay what is demonstrated to be inevitable. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 280 (Minn.1986).

■ Clearly, grounds existed to terminate parental rights at the time of the first termination order in April 1998. The issue directly before us, though, is whether such grounds existed at the time of the second termination in June 1999. We hold that they did.

Under Minn.Stat. § 260C.301, subd. 1(b)(5), a court's finding that "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement" is a valid ground for terminating parental rights to a child. A presumption that reasonable efforts have failed arises upon a showing that:

(i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. * * *;

(ii) the court has approved a case plan [that has been] filed with the court * * *;

(iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and

(iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

*Id.* subds. 1(b)(5)(i)–(iv) (2000).

Although the district court's June 1999 order did not specifically reference each of the factors listed in the statute, the findings of fact in that order demonstrate an

---

7. This court has decided at least two cases in which stayed orders of termination had been issued. *In re Welfare of J.M.,* 574 N.W.2d 717, 719 (Minn.1998); *In re Welfare of C.L.L.,* 310 N.W.2d 555, 556 (Minn.1981). In neither case did we discuss the practice of issuing such stayed orders.

evidentiary basis to support the existence of the factors listed. The findings provide a sufficient basis for us to conclude that there is clear and convincing evidence that the conditions of subdivision 1(b)(5) are satisfied. *See A.D.*, 535 N.W.2d at 648–49 (concluding, in the context of a termination based on a child being neglected and in foster care, that the district court did not need to address *each* of the items listed in the statute as factors to be considered in determining whether a child is neglected and in foster care).

With respect to the first, second and fourth factors in subdivision 1(b)(5), the findings demonstrate that P.R.L. has been placed out of his mother's home since 1996, that the district court approved a case plan filed with it, and that Hennepin County has made reasonable efforts, including the agreement that led to the 1998 Stayed Order, to rehabilitate the parent and re-unite the family.

As regards the third factor, the conditions leading to P.R.L.'s out-of-home placement have not been corrected and respondent has failed to comply with a reasonable case plan. Respondent's relationship with Richardson is, and has been for years, the primary basis of her unfitness to be a parent. In September 1994 respondent was ordered to refrain from having contact with Richardson and to enforce protective orders against him. These requirements were continually reiterated to respondent in later court orders. She has failed to comply with every no-contact order given her. Respondent no longer claims that she has no contact with Richardson but argues instead that such contact is reasonable in light of changed circumstances.

Respondent's argument that her situation with Richardson is changed because of the treatment he is undergoing fails. As the district court found in its 1999 termination order, the same case plan that requires Richardson to undergo domestic abuse treatment denies Richardson visitation rights with his son if he is with respondent. There is no indication that the long-persisting detrimental relationship between respondent and Richardson, the condition that led to P.R.L.'s out-of-home placement, has changed.[8]

■ Thus, a presumption has been created that following P.R.L.'s placement out of the home, reasonable efforts, under the direction of the district court, have failed to correct the conditions leading to P.R.L.'s placement. As respondent has not rebutted the presumption that reasonable efforts have failed, we hold that the district court's June 1999 order contains findings sufficient to terminate respondent's parental rights as to P.R.L. under Minn.Stat. § 260C.301, subd. 1(b)(5). Because a court need find only one of the statutory grounds provided in Minn.Stat. § 260C.301, subd. 1(b) (2000), to terminate a parent's rights to a child, we need not address the remaining grounds for termination considered by the district court. *See A.D.*, 535 N.W.2d at 650.

Reversed.

---

8. Respondent argues that under *Chosa,* 290 N.W.2d at 769, it must appear that the conditions giving rise to the termination will continue for a "prolonged, indeterminate period." The long history of respondent's refusal to terminate her relationship with Richardson, despite several orders from the district court that she do so, suffices to meet any such requirement that might exist. Therefore, we address neither DCFS's argument that requiring such a finding by the district court is outdated and inconsistent with current statutory law, nor respondent's argument that DCFS's argument on this issue is not timely.