*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2047**

In the Matter of the Welfare of the Child
of: P. A. S. and D. J. P., Parents.

**Filed May 23, 2016
Affirmed
Smith, John, Judge***

McLeod County District Court
File Nos. 43-JV-15-138, 43-JV-14-193

Michael Junge, McLeod County Attorney, Amy E. Olson, Assistant County Attorney, Glencoe, Minnesota (for respondent McLeod County Social Services)

Tiffany Doherty-Schooler, Glencoe, Minnesota (for appellant-father D.J.P.)

L. Erica Mendez, Gaylord, Minnesota (guardian ad litem for child)

Considered and decided by Halbrooks, Presiding Judge; Hooten, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH, JOHN**, Judge

We affirm the district court's termination of appellant-father's parental rights because the district court did not abuse its discretion in finding there was clear and convincing evidence that (1) reasonable efforts by the county failed to correct the

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

conditions leading to the child's out-of-home placement, (2) the child was neglected and in foster care, and (3) termination is in the child's best interests.

## FACTS

M.C.P. was born on December 4, 2012, to mother, P.A.S., in Hutchinson, Minnesota. Appellant-father, D.J.P., is the legal, non-custodial father of M.C.P. Mother is chemically dependent and has a history of abusing methamphetamine and heroin.

After birth, M.C.P. lived under the care of mother and father, who frequently changed residences. In the summer of 2014, mother and father were homeless and living in a tent with M.C.P. along a river in Hutchinson. On August 16, 2014, mother and father got into a dispute, and father took M.C.P. and carried him for seven to eight hours along the shoulder of State Highway 212. Father claimed he took M.C.P. because mother was using illegal drugs, and he was seeking help in Glencoe. After mother was reunited with M.C.P., she obtained an order for protection (OFP) against father.

On October 6, 2014, father reported to police that mother was residing in a house with M.C.P. where the residents were smoking methamphetamine in front of M.C.P. and other children. On October 9, 2014, law enforcement, along with McLeod County Social Services (MCSS), visited the house. MCSS confirmed that there was illegal drug use and removed M.C.P. from mother's care. A hair follicle test on M.C.P., then 21 months, was positive for methamphetamine. M.C.P. has remained in foster care since October 9, 2014.

MCSS filed a petition alleging that M.C.P. was a child in need of protection or services (CHIPS) based on M.C.P.'s exposure to drugs and allegations of father's history

2

of chronic drug use and domestic violence against mother. The district court adjudicated M.C.P. a child in need of protection or services on October 27, 2014.

MCSS developed case plans for the parents. In the course of the case, there were one social-services plan and two out-of-home placement plans for father. Father signed the original social-services plan but would not sign the out-of-home placement plans. Mother initially made progress on her case plan, but in March 2015 she left chemical-dependency treatment and disappeared after telling a social worker she wanted M.C.P. to be adopted by her relatives in Texas. The CHIPS case then refocused on father, M.C.P.'s remaining parent. The out-of-home placement plan required father, among other things, to (1) remain chemical free, (2) obtain stable, independent housing, (3) demonstrate the ability to independently parent, and (4) learn and demonstrate parenting skills with a parenting educator.

When the CHIPS case commenced in October 2014, father was residing with Kathy Anderson. MCSS informed father that Anderson's home was not suitable for M.C.P. because her parental rights to another child were previously terminated. Father then moved into the residence of Ken and Stacey Hormann. The Hormanns welcomed father into their home and supervised court-ordered visitations between father and M.C.P. Despite having a job at the time, father never paid the Hormanns rent.

Eventually father was awarded unsupervised visits with M.C.P. at the Hormanns. On June 20, 2015, on his second unsupervised visit, father took M.C.P. to a Narcotics Anonymous picnic. Around 10:00 p.m., Ms. Hormann became worried because father and M.C.P. had not returned, and she called the social worker, who in turn called the police.

Father returned with an exhausted M.C.P. around midnight. MCSS arrived at 1:30 a.m. and removed M.C.P. from father's care.

The next day father moved out of the Hormanns and moved into Randy and Teresa Stille's home. For ten years the Stilles were licensed foster care providers through McLeod County. Father resided with the Stilles from June 2015 until the date of the termination of parental rights (TPR) trial. Father paid the Stilles a modest rent, helped around the house, and paid for some of the grocery bills. Ms. Stille was the supervisor of father's visits with M.C.P. and she provided father transportation.

When father began chemical testing in February 2015, he tested positive for alcohol. In May and June of 2015 father tested positive for morphine. At the trial Father denied taking morphine. The district court found that father's denial was not credible.

Father consistently visited M.C.P. at a visitation center, per his case plan. The assigned social worker testified at trial she could not recall father missing any of the 20 or more visitations and that the visits were "very positive." Father continued visits with M.C.P., supervised by Ms. Stille, and the parenting educator, Laural Olson.

Olson provided father with more than 50 hours of parenting education at 12 or more meetings from May, 21, 2015, until October 13, 2015. Olson described father as "hostile," and "angry, vindictive, and bitter" in her parenting education notes. Father and Olson never established a functional working relationship. Father ignored suggestions and directives and argued with Olson, complaining about the county and his feeling that he inherited the CHIPS case from mother. Father sparred with Olson over parenting styles: father had a permissive and playful style, while Olson espoused a more directive style. For example,

4

father told Olson that he thought it was "bullsh-t to try to make a child nap." At trial father described his parenting philosophy as: "Love your kid." Olson stressed that father needed to learn how to direct M.C.P. to take independent naps, eat more nutritious meals, and limit electronic screen time. According to Olson, father's lack of parental authority constituted neglect. Olson testified that, in terms of father's parenting skills, "there wasn't going to be change." Olson thought father's parenting after 55 hours of education was "woefully inadequate," and she did not believe M.C.P. would be "well served" to have father as his parent.

On July 13, 2015, MCSS filed a TPR petition alleging that reasonable efforts failed to establish permanency for M.C.P. with his father. On December 1, 2015, after three days of trial, the district court issued an order terminating father's parental rights on the following statutory grounds: (a) failure to satisfy the duties imposed by the parent-child relationship, (b) palpable unfitness, (c) failure of reasonable efforts to correct the conditions leading to the out-of-home placement, and (d) M.C.P. being neglected and in foster care. The district court also found that the termination is in M.C.P.'s best interests.

## D E C I S I O N

**I.    The district court did not abuse its discretion in finding that statutory grounds for termination were proven by clear and convincing evidence.**

"Parental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of Simon*, 662 N.W.2d 155, 162 (Minn. App. 2003). A district court may terminate parental rights if clear and convincing evidence establishes that at least one statutory basis for termination exists and termination is in the best interests of the child.

*Id.* Findings in a TPR trial will not be reversed unless clearly erroneous or unsupported by substantial evidence. *In Re Welfare of B.A.B.*, 572 N.W.2d 776, 778 (Minn. App. 1998). "Under the clearly erroneous portion of this court's review of the district court's findings, a district court's individual fact-findings will not be set aside unless the review of the entire record leaves this court with the definite and firm conviction that a mistake has been made." *Id.* (quotations omitted). In reviewing a TPR order, this court will study the record carefully to determine whether the evidence is clear and convincing. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004).

Father argues the evidence was insufficient on each of the four statutory bases used to terminate his parental rights.

### *Reasonable efforts failing to correct the conditions leading to M.C.P.'s placement*

Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying . . . facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

Under Minnesota law, a statutory basis for terminating parental rights is present if clear and convincing evidence shows that "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5) (2014);

*B.A.B.*, 572 N.W.2d at 778. It is presumed that reasonable efforts have failed upon a showing that (1) a child has resided outside the parental home for a cumulative period of 12 months within the preceding 22 months; (2) the court has approved an out-of-home placement plan; (3) the conditions leading to the child's out-of-home placement have not been corrected; and (4) reasonable efforts have been made by the social services agency to rehabilitate and reunite the family. Minn. Stat. § 260C.301, subd. 1(b)(5)*; see id.*, subd. 1(b)(5)(i) (stating that in the case of a child under eight years the presumption applies when the child has resided outside the home for six months unless the parent has maintained regular contact and has complied with the out-of-home placement plan). It is also presumed that the conditions leading to out-of-home placement have not been corrected upon a showing that a parent has "not substantially complied with the court's orders and a reasonable case plan." *Id.*, subd. 1(b)(5)(iii). While a district court's TPR order need not specifically reference each of the factors listed in the statute, the findings in the order must demonstrate an evidentiary basis to support the existence of the factors listed. *In re Welfare of P.R.L.*, 622 N.W.2d 538, 544–45 (Minn. 2001).

The district court found in its TPR order that reasonable efforts had been provided by the county and that father was unable or failed to meaningfully engage in the services provided. The district court found that father's "failure to change or simply improve his personal and chronic unstable life, as well as his failure to demonstrate the parenting skills necessary to achieve and maintain a successful reunification with [the child] support termination." Thus, the district court concluded that reasonable efforts had failed to correct the conditions leading to M.C.P's out-of-home placement.

7

The record supports the district court's findings of fact on these matters and shows that the elements of Minn. Stat. § 260C.301, subd. 1(b)(5), were satisfied by clear and convincing evidence. At the time of the TPR trial, the child had been placed out of the home for more than 12 months. The court approved and reviewed father's out-of-home placement plans. Furthermore, there was evidence that was clear and convincing showing that the conditions leading to the child's out-of-home placement had not been corrected. For example, the record supports the district court's finding that father had not demonstrated, per his case plan, that he can provide basic parenting skills, boundaries, and discipline. Father displayed his resistance to obtaining parenting skills by arguing with Olson, the parenting educator; ignoring Olson's reasonable directives and suggestions; and complaining about McLeod County and the CHIPS case. Father failed to show that he acquired the skills necessary to successfully parent his child. He also refused to speak to the parenting educator during an entire four-hour visit and fell asleep on the couch during another visit. Olson testified that father's case was the most frustrating she had experienced in over four decades of work in her field. Finally, Olson testified that father's parenting skills were woefully inadequate and that there was not going to be any change.

Instead of taking the parenting educator's testimony at face value, the district court thoughtfully inquired of Olson whether father's resistance to the parenting education was the result of her specific advice or whether father had a problem taking advice from others in general. The parenting educator testified that it was both, and the district court credited her testimony. The district court stands in a superior position to this court in assessing witness credibility. *In re Matter of Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn. 1995).

8

The record also supports the district court's findings that father had not improved his unstable lifestyle because father moved three separate times during the CHIPS proceedings and left the stable environment of the Hormann residence.

Finally, the evidence is clear and convincing that MCSS made reasonable efforts to reunite M.C.P. with father. Specifically, MCSS provided the following services to father: (1) 50-plus hours of in-home parenting education at multiple residences, (2) a search for an alternative parenting educator after father's objection to continuing services with Olson, (3) supervised visitation in multiple settings, (4) transportation services, (5) a referral to individual therapy to address anger, (6) a referral to obtain a chemical dependency evaluation and payment of fee, and (7) a referral to a parenting assessment and payment of fee.

Father argues that Minn. Stat. § 260C.301, subd. (1)(b)(5), cannot apply to him because mother's action of exposing M.C.P. to drugs was the condition that led to M.C.P.'s out-of-home placement. Father relies on a footnote from *In re Welfare of Children of T.R.*, where the supreme court stated, "[W]e note that it is questionable whether the parental rights of . . . a noncustodial parent, could be terminated under section 260C.301, subdivision 1(b)(5)," where the grounds brought forth for termination did not lead to the removal of the child from the home. 750 N.W.2d 656, 663 n.5 (Minn. 2008). The court in *T.R.* determined that the noncustodial parent's substance use was not a factor in the county's decision to place the child in foster care. *Id.* Here, however, allegations of father's substance use and domestic violence, as alleged in mother's OFP, were noted in the county's original CHIPS petition. Therefore, this case is unlike *T.R.*

9

Furthermore this court has held, "Even if the parent eliminates the factual bases that existed at the time of the child's removal, if a new factual basis arises after removal, the condition [for keeping the child out of the home] cannot be corrected until that new factual basis also has been eliminated." *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 323 (Minn. App. 2015), *review denied* (Minn. July 21, 2015). Thus, the fact that father's housing instability or parenting abilities came up after removal of M.C.P. from the home does not relieve father of a duty to eliminate these factual bases.

Father argues, in the alternative, that the conditions leading to M.C.P.'s out-of-home placement were resolved and that father complied with his case plan. But the record shows father did not comply with his case plan by failing to cooperate with the parenting educator, failing to obtain parenting skills, failing drug tests, and moving residences frequently.

In sum, the district court did not abuse its discretion in concluding that reasonable efforts failed to correct the conditions that led to M.C.P.'s out-of-home placement.

### Neglected and in foster care

The district court did not abuse its discretion in finding M.C.P. was "neglected and in foster care"—another statutory basis a district court may use to terminate parental rights. Minn. Stat. § 260C.301, subd. 1(b)(8) (2014). "Neglected and in foster care" means a child:

> (1) who has been placed in foster care by court order; and
> (2) whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and
> (3) whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have

willfully failed to meet reasonable expectations with regard to visiting the child or providing financial support for the child.

Minn. Stat. § 260C.007, subd. 24 (2014).

In determining whether a child is neglected and in foster care, a district court shall consider the following:

> (1) the length of time the child has been in foster care;
> (2) the effort the parent has made to adjust circumstances, conduct, or conditions that necessitates the removal of the child to make it in the child's best interest to be returned to the parent's home in the foreseeable future, including the use of rehabilitative services offered to the parent;
> (3) whether the parent has visited the child within the three months preceding the filing of the petition . . . ;
> (4) the maintenance of regular contact or communication with the agency or person temporarily responsible for the child;
> (5) the appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;
> (6) whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time, whether the services have been offered to the parent, or, if services were not offered, the reasons they were not offered; and
> (7) the nature of the efforts made by the responsible social services agency to rehabilitate and reunite the family and whether the efforts were reasonable.

Minn. Stat. § 260C.163, subd. 9 (2014).

Here, the evidence supports the district court's finding that M.C.P. was "neglected and in foster care." As already discussed, MCSS provided numerous rehabilitative services to father. M.C.P. had been lingering in foster care for over 12 months at the time of trial. Furthermore, father had not demonstrated that reunification could ever be successfully

11

accomplished, given his lack of cooperation in obtaining parenting skills and lack of progress in altering his instability.

Father argues that the district court erred in its conclusion because, while M.C.P. has been in foster care, there has been consistent parenting time with father and father has made significant adjustments to reunify with M.C.P. Yet, while the district court commended father on making all of his visitations and recognized father has his chemical use under control, the court also found that father has not shown any marked improvement in his parenting or housing situation and that father was resistant to every suggestion given to him by the parenting educator.

Father also argues that the district court erred in failing to consider the specific factors in Minn. Stat. § 260C.163, subd. 9, in determining the child was "neglected and in foster care." However, a district court need not address each factor listed in Minn. Stat. § 260C.163, subd. 9, in its order but must "show consideration for them in its findings." *In re Welfare of J.S.*, 470 N.W.2d 697, 704 (Minn. App. 1991), *review denied* (Minn. July 24, 1991). The district court's findings and conclusions were detailed, thorough, and went to the substance of most, if not all, of the factors listed in Minn. Stat. § 260C.163, subd. 9. In sum, the district court acted within its discretion in finding that M.C.P. was neglected and in foster care.

Because only one statutory basis is required to terminate a person's parental rights, *Simon*, 662 N.W.2d at 162, and clear and convincing evidence supports the termination of father's parental rights for failure to correct the conditions that led to M.C.P.'s out-of-home

placement, and because M.C.P. was neglected and in foster case, we need not address the other statutory bases upon which the district court terminated father's parental rights.

**II.    The district court did not abuse its discretion in finding that termination was in M.C.P's best interests.**

"Once a district court determines that at least one of the statutory grounds for termination has been met, it must also find that termination is in the child's best interests." *In re Welfare of Children of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). This analysis consists of weighing three factors: (1) the child's interest in maintaining the parent-child relationship, (2) the parent's interest in maintaining the parent-child relationship, and (3) any competing interest of the child. *Id.* "Competing interests include a stable environment, health considerations, and the child's preferences." *Id.* This court reviews a district court's determination that termination of parental rights is in a child's best interests for an abuse of discretion." *J.R.B.*, 805 N.W.2d at 905.

Father argues that the evidence was not clear and convincing that termination is in M.C.P.'s best interests because: (1) M.C.P. was afforded the consistent companionship of father and appears comfortable, bonded, and cared for by his father; (2) father's interest in preserving the relationship is undisputed, given the care, time, and attention he has given M.C.P., and (3) M.C.P.'s competing interests include maintaining a relationship with his two half-siblings and foster family, which might not be met if he was adopted by mother's relatives in Texas.

Balancing the factors, the district court acknowledged father's weighty interest in maintaining the parent-child relationship by recognizing that this case is different in that

13

father has always been physically present for M.C.P., has never missed visits, and that it is clear father wants nothing more than to be M.C.P.'s parent. However, the district court credited the testimony of the social worker, the guardian ad litem, Ms. Hormann, and the parenting educator that father would not be an adequate parent despite his love and physical presence. The court found:

> Despite the breadth of services provided by the County and the help and support from the well-intentioned persons who accepted [father] into their home, he cannot provide even the basic home environment and parenting (nutritious diet, appropriate direction and discipline, etc.) that [M.C.P.] needs and deserves. [M.C.P.] is but two years old, and although only basic parenting skills were modeled and expected of [father] during his supervised visits with [M.C.P.], he was consistently unable to demonstrate those basic skills. As [M.C.P.] ages and grows, the parenting skills required of [father] will grow exponentially. He has not demonstrated that he will or even can assimilate those skills.

Furthermore, the court found that M.C.P.'s care providers noticed a steady deterioration of M.C.P.'s emotional behavior following visits with father and that M.C.P's repeated exposure to changing and multiple caregivers is confusing and unsettling for M.C.P.

Finally, father argues society and the law do not justify the removal of children from mediocre parents to give them to people who excel at parenting, or are wealthier, so that a child can meet his or her highest potential. We do not disagree. However, this is not the case here. Father's rights were terminated not because he is simply a mediocre parent or because he lacks financial resources. Instead, the record supports the district court's finding that father lacks very basic parenting skills to adequately care for and provide stability for M.C.P. and that the situation is not going to improve.

14

We conclude that the district court, in its thorough, well-reasoned and complete order, acted well within its broad discretion by carefully weighing and analyzing the best-interest factors and coming to the conclusion that M.C.P.'s competing interest in obtaining a permanent environment that is safe, stable, and secure is not outweighed by father's and M.C.P.'s interests in maintaining the parent-child relationship.

**Affirmed**.