*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0270**

In the Matter of the Welfare of the Children of: S. S., Parent

**Filed August 22, 2016
Affirmed
Larkin, Judge**

Ramsey County District Court
File No. 62-JV-15-1265

Joanna Woolman, Child Protection Clinic, Ruta Johnsen (certified student attorney) Mitchell Hamline School of Law, St. Paul, Minnesota (for appellant)

John J. Choi, Ramsey County Attorney, Kathryn Eilers, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Dorothy Gause, Dorothy M. Gause, LLC, Stillwater, Minnesota (for guardian ad litem Jan Biebel)

Considered and decided by Larkin, Presiding Judge; Smith, Tracy M., Judge; and Klaphake, Judge.[*]

## UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant-mother challenges the district court's termination of her parental rights, arguing that a statutory basis for termination was not established by clear-and-convincing

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

evidence, that reasonable efforts were not made to reunify her family, and that termination is not in her children's best interests. We affirm.

## FACTS

Appellant-mother S.S. is the biological mother of M.H.S., born in 2008, and K.S., born in 2010.[1] In April 2014, respondent Ramsey County Community Human Services Department (department) filed a petition alleging the children were in need of protection or services (CHIPS) and requesting that the children be placed in emergency protective care. The CHIPS petition alleged that in November 2013, M.H.S. missed the school bus and a resident of the apartment building where mother and the children lived informed security that M.H.S. was missing. Another resident of the apartment complex found M.H.S. and took her to school. Afterwards, mother told security that she had told M.H.S. to go to S.J.'s apartment, who was mother's boyfriend at the time. Later that month, the department received a report that the children were locked in a bedroom while in S.J.'s care. Mother told security that she told S.J. to lock the children in her bedroom if he left the apartment. When security entered the apartment, they found the children alone and unsupervised. Mother signed a Ramsey County family working agreement, agreeing that she would not leave her children in S.J.'s care. Nonetheless, in April 2014, K.S. was at S.J.'s apartment, and mother admitted to a department representative that both children go to S.J.'s apartment to play.

---

[1] The district court terminated the parental rights of M.H.S.'s adjudicated father by default on June 18, 2015. K.S. does not have a legal father.

2

The CHIPS petition also alleged that in April 2014, mother contacted the St. Paul Police Department and reported that M.H.S. had been sexually abused by M.H.S.'s adult male cousin. Mother told the department that the children spent weekends at this relative's home so mother could have a break. M.H.S. had been sexually abused two additional times in the two preceding years: once by a babysitter's adult son and once by a friend's father when she spent the night at his home. After the most recent sexual abuse, staff at Midwest Children's Resource Center (MCRC) expressed concerns about mother's failure to enroll M.H.S. in therapy despite recommendations that she do so, as well as mother's failure to provide consistent care for M.H.S.'s eczema and follow through on a recommended dermatology appointment.

Mother admitted the CHIPS petition, and the district court adjudicated the children in need of protection or services. The child-protection worker assigned to work with mother referred her to REM Parenting for in-home parenting services. Mother's in-home parenting worker met with mother and her children weekly for 17 months. The main goals of mother's parenting education were for mother to exhibit protective capacities, identify appropriate people to be around her children, and display parenting skills tailored to her children's mental-health needs.

The parenting worker reported that she observed an improvement in mother's use of disciplinary techniques but expressed concerns regarding mother's use of inappropriate language around the children. For example, mother called one of the children a "pussy" during a visit. In addition, mother often required prompting to interact with the children during visits, brought a friend or family member to visits despite being instructed that such

3

persons could participate in visits only with prior child-protection approval, and heavily relied on the foster-care provider and parenting worker to plan visits and provide food for the children during visits. Mother also allowed her children to have contact with S.J. and introduced the children to other men during visits. After the parenting worker reviewed mother's parenting assessment with her, mother threatened to blow up the building where the parenting assessor worked, with the parenting assessor in it. REM's last progress report regarding mother states that "[mother] has reached a point at which she is not retaining new information and continues to demonstrate the same behavioral lack of progress that she has demonstrated since the beginning."

Most of mother's visitation with the children was supervised. It generally occurred in parks and at a restaurant near mother's home. Supervised visits were attempted in mother's home, but M.H.S. did not want to visit there because M.H.S. was afraid of being locked in a bedroom again. Several aspects of mother's home environment also deterred the department from having visits there. For example, a couple lived in mother's home for an extended period of time after child protection became involved. Mother's friends and their children also stayed in mother's home for shorter periods. It took repeated encouragement by the children's guardian ad litem (GAL) to get mother to remove these people from her home. The GAL also repeatedly asked mother to remove a stick of burnt incense that was sticking out of a wall of the home because it was a potential fire hazard. In addition, mother's home contained graffiti that included inappropriate language and content related to a friend's death. Mother did not cover this graffiti until nearly a year after the GAL and her parenting worker repeatedly asked her to do so.

4

In April 2015, the department petitioned to terminate mother's parental rights to the children, alleging that mother's "mental health issues, lack of protective capacity and insufficient progress in demonstrating appropriate parenting skills" had significantly impacted her ability to meet the parenting needs of the children and that mother "lacks the necessary parenting skills, consistent care giving and protective capacity that [the children] need at this time."

In October 2015, the district court granted mother unsupervised visitation with the children. Mother allowed two men that the children did not know to be present during one of the unsupervised visits at her home. Mother had met one of the men, J., on a dating website, did not know his last name, and had only seen him four times in person prior to the unsupervised visit. During the visit, J. tried to bite mother, slapped her buttocks, and attempted to pull her into her bedroom. Mother subsequently asked J. to leave her home and he did so.

M.H.S. spent the evening before another unsupervised visit in the emergency room because she was ill from asthma complications. The children's foster parent sent M.H.S.'s prescribed medications and nebulizer treatment to the visit and provided mother instructions regarding administration of the nebulizer treatment. Mother allowed M.H.S. to administer her own nebulizer treatment and to do so through her nose because M.H.S. did not want to do the treatment through her mouth. And mother did not supervise M.H.S.'s administration of the nebulizer treatment. Later, mother called the children's foster parent to ask for help because M.H.S. was wheezing and having difficulty breathing. Because the nebulizer treatment was administered incorrectly, the children's foster parent had to return

5

M.H.S. to the hospital. The district court ended mother's unsupervised visits based on the incidents described above.

In December 2015, the district court held a trial on the termination of parental rights (TPR) petition. Following the trial, the district court concluded that all four of the alleged statutory grounds for termination were supported by clear-and-convincing evidence. The district court also found that the department had provided reasonable efforts to rehabilitate mother and reunify the family. The district court concluded that termination of parental rights was in the children's best interests and terminated mother's parental rights to the children. Mother appeals.

## D E C I S I O N

There is a "presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child." *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). "Ordinarily, it is in the best interest of a child to be in the custody of his or her natural parents." *Id.* Thus, "[p]arental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990).

In a proceeding to terminate parental rights, "[t]he petitioner . . . bears the burden of producing clear and convincing evidence that one or more of the statutory termination grounds exists." *In re Matter of Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988); *see* Minn. Stat. § 260C.317, subd. 1 (2014) (requiring "clear and convincing evidence" of a statutory basis to terminate parental rights).

A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of trial. *In re Welfare of Child of T.D.*, 731

N.W.2d 548, 554 (Minn. App. 2007), *review denied* (Minn. July 17, 2007). An appellate court "exercises great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996). On appeal, this court examines the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). This court gives the district court's decision to terminate parental rights considerable deference but "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

This court will affirm the district court's decision to terminate parental rights if at least one statutory ground for termination is supported by clear-and-convincing evidence, termination is in the best interests of the child, and the county has made reasonable efforts to reunite the family. *Id.* To determine whether a particular statutory ground for termination is supported by clear-and-convincing evidence, a district court must first "find[] the underlying facts regarding the statutory criteria relevant to a particular basis for terminating parental rights" and then "in light of its findings of those underlying facts, exercise[] its judgment to address whether that basis for terminating parental rights is present." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899-900 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). The district court "may, but is not required to, terminate a parent's rights when one of the nine statutory criteria is met." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136-37 (Minn. 2014) (quotation omitted).

**I.**

The district court terminated mother's parental rights based in part on Minn. Stat. § 260C.301, subd. 1(b)(4) (2014).[2] Minn. Stat. § 260C.301, subd. 1(b)(4), allows termination when a parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

A parent's demonstrated failure to protect children from abuse by others combined with conditions that put the children at risk for future abuse can justify a determination that the parent is palpably unfit to be a party to the parent-child relationship. *See In re Children of T.A.A.*, 702 N.W.2d 703, 708-09 (Minn. 2005) (affirming palpable unfitness determination where parent failed to protect her children from abuse by others in the past and refused to recognize her responsibility to protect her children from abuse).

Mother argues that "clear and convincing evidence does not support a finding that [she] was palpably unfit and will not be able to resume care of her children in the reasonably foreseeable future."

---

[2] The district court also relied on three other statutory grounds to terminate mother's parental rights: Minn. Stat. § 260C.301, subd. 1(b)(2) (parent has failed to comply with parental duties), (b)(5) (reasonable efforts have failed to correct conditions leading to child's placement), (b)(8) (child is neglected and in foster care) (2014).

8

The district court's palpable-fitness determination is supported by its findings that mother (1) "failed to develop the necessary protective capacity over the course of the child protection case," (2) failed to demonstrate that "she understands her children's mental health and behavioral needs and can successfully parent them and keep them safe," and (3) "lack[ed] [an] understanding of how important maintaining her mental health . . . is" and how her failure to care for her mental health "acts as a barrier to her successfully parenting the children." We address each finding in turn.

*Protective Capacity*

The record clearly and convincingly establishes that the children have experienced trauma at the hands of caregivers selected by mother and that mother has failed to develop the skills necessary to protect the children. M.H.S. has been sexually abused three times by three different caregivers. In addition, mother testified that her former boyfriend, S.J., physically disciplined both children, using belts and hangers to spank them, and that S.J. locked the children in their bedroom and left them alone in their apartment.

Mother argues that "[the department] produced no evidence that [her] behavior, especially at the time of termination, was detrimental to the children" and contends that she has "demonstrated an ability to recognize an inappropriate situation and discontinue engaging in it." However, two months before the TPR trial, mother allowed multiple adults that the children did not know to be present during a visit, and one of the adults engaged in sexual behavior in front of the children. Mother's decision to allow the men to enter her apartment during a visit shows that she had not developed the ability to recognize individuals who posed a potential risk to the children.

9

At trial, mother acknowledged that she had made a mistake and testified that she had since notified potential visitors that they could not come to her apartment when the children were visiting. But mother also testified that she has "a hard time telling people no" in such situations and that is why she had been reluctant to force her roommates to leave after repeated encouragement from the department and the GAL. Moreover, even though mother testified that it is traumatic for the children to see S.J., they continue to see him in the hallways of the apartment building where mother lives.

*The Children's Mental-Health and Behavioral Needs*

The record clearly and convincingly establishes that both children have special needs that mother is unable to meet. M.H.S. has been diagnosed with post-traumatic stress disorder (PTSD), depression, asthma, and eczema. M.H.S.'s PTSD resulted from the abuse and neglect she experienced while in mother's care. Mother failed to enroll M.H.S. in therapy after M.H.S. was sexually abused a second time, despite recommendations from MCRC. During a supervised visit in July 2015, more than a year after mother began working with her parenting worker, mother talked to M.H.S. about S.J., causing M.H.S. to become upset and walk away from mother. Mother also allowed M.H.S. to administer her own nebulizer treatment improperly and without supervision, resulting in M.H.S.'s hospitalization.

K.S. has been diagnosed with adjustment disorder with mixed disturbance of emotions and conduct, attention-deficit/hyperactivity disorder (ADHD), speech sound disorder, and developmental coordination disorder. The children's foster parent and the GAL testified that it is difficult for a caregiver to handle K.S.'s behaviors. Mother testified

10

that she is afraid of K.S. because "[K.S.] might get too out of control to where [mother] can't handle her."

*Mother's Mental-Health Needs*

The record clearly and convincingly establishes that mother's mental health impacts her ability to parent and that she has failed to appreciate and address her mental-health issues. Mother reported a history of mental-health issues and sexual abuse in her childhood. Mother testified that she had depression for over 15 years, suffered from anxiety and anger issues, and attempted suicide in August 2014.

Despite repeated encouragement from the department and her parenting worker, mother did not obtain psychiatric and psychological evaluations or participate in therapy on a consistent basis until more than a year after the child-protection case opened. Mother's parenting worker testified that mother initially did not obtain the evaluations or participate in therapy because she did not want help and did not think she needed it.

Mother's psychiatric evaluator diagnosed her with major depression, recurrent; generalized anxiety disorder; panic disorder with agoraphobia; alcohol dependence; cannabis dependence; and attention deficit disorder. The psychiatric evaluator prescribed medication for mother, but mother stopped taking it after two weeks because she thought the dosage was too high. Mother did not return to her doctor to have the dosage adjusted and was not taking any psychiatric medications at the time of the TPR trial.

Mother's parenting assessor opined that mother's mental-health symptoms "have a significant influence on her ability to provide parenting to her daughters and maintain their safety." The assessor wrote that mother's "lack of maturity, concrete orientation and

11

limited judgment increased her children's risk for harm." The assessor also wrote that mother "seem[s] to have minimal insight into how her underlying mental health problems interfere with her everyday functioning as well as the challenging needs associated with developing children and maintaining their safety."

In sum, clear-and-convincing evidence supports the district court's findings regarding mother's lack of protective capacity, inadequate understanding of the children's mental-health and behavioral issues, and inadequate understanding of her own mental-health issues. These findings support the district court's determination that mother is palpably unfit to be a party to the parent and child relationship. Minn. Stat. § 260C.301, subd. 1(b)(4). Because the record clearly and convincingly establishes palpable unfitness as a ground for termination under Minn. Stat. § 260C.301, subd. 1(b)(4), we do not review the three other statutory grounds on which the district court relied. *See T.A.A.*, 702 N.W.2d at 708 ("Only one ground must be proven for termination to be ordered.").

**II.**

The termination statute requires "specific findings" in every TPR proceeding "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or "that reasonable efforts [were] not required" as set out in Minn. Stat. § 260.012 (2014). Minn. Stat. § 260C.301, subd. 8 (2014). The district court must make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." *Id.*, subd. 8(1). In determining whether the county made reasonable efforts, the district court must consider whether the county offered services that were "(1) relevant to the safety and protection of

12

the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h). Alternatively, the district court may rule, after making the relevant factual findings, that "provision of services or further services for the purpose of rehabilitation is futile and therefore unreasonable under the circumstances." *Id.*

Mother argues that the district court erred "in finding that [the department] provided [her] with reasonable efforts" because "the services offered by [the department] were not adequate to meet the family's needs, were not realistic and were not timely."

The district court concluded that "[the department] provided [mother] with reasonable efforts in support of reunification." The district court found that "[t]he in home parenting worker, parenting assessment, and mental health services were relevant for [mother] to develop the necessary skills to ensure safety and protection of the children." It also found that "[t]he services, particularly the seventeen (17) months with the in home parenting worker, and referrals for mental health services, were adequate to meet the family's needs" and that all services were culturally appropriate, realistic under the circumstances, and available and accessible. It further found that although "[the department] offered services in a timely manner," mother "did not participate in services in a timely manner," noting that mother "did not participate in a parenting assessment, psychological evaluation, psychiatric evaluation, or regular therapy until a year or more after her child protection case opened."

Mother argues that although multiple child-protection workers testified that she needed to gain insight into her mental-health needs and how those needs affected the

13

children, none of the child-protection workers assigned to her case ever contacted the therapist that she was seeing at the time of trial. Mother further argues that because the child-protection workers did not contact her therapist, they were neither "able to refer [mother] to services that were appropriate given [her] diagnosed cognitive deficiencies," nor able to "tailor their work with [mother] with the understanding that [mother] processes information differently and struggles with short-term memory issues."

Mother's case plan required her to obtain updated psychiatric and psychological evaluations and follow the evaluators' recommendations. One of the child-protection workers assigned to work with mother testified that she provided mother a phone number for Ramsey County Adult Mental Health, a facility where mother had previously obtained services, to schedule an updated mental-health assessment. Mother initially was reluctant to obtain the evaluations and participate in therapy, despite encouragement from her child-protection and parenting workers, and she did not obtain a psychological or psychiatric evaluation until more than a year after the children were placed out of home. One of mother's child-protection workers attempted to schedule mental-health appointments for mother but was unsuccessful because providers required the client to make the appointment. The psychologist who eventually completed mother's psychological evaluation met with mother to review the evaluation in October 2015 and only had four therapy sessions with mother prior to the TPR trial.

In sum, mother was responsible for the delayed evaluations and her contact with her therapist at the time of trial was limited. We are not persuaded that the department's failure to contact that therapist renders its efforts unreasonable. Moreover, mother's parenting

14

worker testified that REM, mother's parenting-education provider, specializes in serving people with disabilities, including those with mental-health issues. That specialization tends to establish that mother's parenting education was realistic and appropriate.

Mother also argues that the department failed to provide meaningful parenting services because the department and REM continued to provide the same services after her progress plateaued. Mother contends that "[n]o evidence was presented to suggest that [the department] made any effort to evaluate the appropriateness of the in-home parenting service, or look at alternative services available." But mother testified at trial that she asked to continue working with her parenting worker after being granted unsupervised visitation, so she could ask for advice, suggesting that the in-home parenting service was helpful. Moreover, the department recognized mother's plateaued progress and referred her for a parenting assessment that was not part of her original case plan. The parenting assessment reported that "the prognosis appears poor for [mother] being able to meet her individual mental health needs and therefore being able to meet her children's growing needs and maintain[] their safety."

At oral argument to this court, mother argued that the department should have provided her with an Adult Rehabilitative Mental Health Services (ARMHS) worker given her mental-health needs. Mother's parenting assessor wrote that mother "might qualify" to receive an ARMHS worker and that an ARMHS worker "would assist her to gain access to mental health services, help her to be compliant with mental health services, and assist her with gaining access to vocational and community support programs," if mother agreed to receive those services. But the record does not establish that an ARMHS worker would

15

have provided mother with services different than those that were provided by mother's parenting worker from REM. Moreover, even if mother might have benefited from an ARMHS worker, it is not clear that the multiple other services the department provided were unreasonable.

Mother complains that she worked with six different child-protection workers during the course of the child-protection case. Although multiple child-protection workers were assigned, mother worked with the same REM parenting worker for 17 months. The parenting worker met with mother weekly and assisted her with multiple aspects of her case plan. For example, the parenting worker provided mother parenting education, supervised mother's visits with the children, transported mother to and from visits, and encouraged mother to schedule therapy and psychiatric appointments. The consistent involvement of one parenting worker offsets the multiple child-protection-worker assignments.

Lastly, mother argues that this case is similar to *In re Children of T.R.*, 750 N.W.2d 656 (Minn. 2008). In *T.R.*, the county did not provide a noncustodial father with a valid chemical-dependency evaluation, despite his acknowledged drug and alcohol use; did not offer him chemical-dependency treatment; made no effort to help him understand the proceedings, despite his lack of verbal skills and low average I.Q.; and never visited a home he rented in an effort to comply with a requirement that he obtain suitable housing. 750 N.W.2d at 665-66. The Minnesota Supreme Court held that the services provided were not reasonable: it contrasted the lack of services the county provided father with the substantial services that the county provided mother and noted that the county did not offer any

16

services to address father's lack of verbal skills and his acknowledged difficulty in understanding the termination proceedings. *Id.* at 666.

The facts of this case are distinguishable from those in *T.R.* Here, the department recognized that mother had mental-health issues and that she needed treatment for those issues to properly care for the children. The department referred mother to a mental-health service provider for assessment and treatment, and it provided an in-home parenting worker who worked with mother weekly for 17 months. And unlike the circumstances in *T.R.*, the record does not suggest that mother did not understand the termination proceedings.

In sum, the record shows that the department provided mother with multiple services over the course of more than a year and a half of child-protection involvement and that the services were tailored to mother's limitations and mental-health issues. The district court's determination that the department made reasonable efforts to reunify mother and the children is supported by clear-and-convincing evidence and does not constitute error.

**III.**

A child's best interests can preclude termination of a parent's parental rights, even if the district court rules that one or more of the statutory bases for terminating that parent's parental rights is present. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). Thus, "a district court's findings in support of any TPR order must address the best-interests criterion." *Id.* at 546; *see* Minn. Stat. § 260C.301, subd. 7 (2014) ("[T]he best interests of the child must be the paramount consideration . . . ."). In making a finding regarding the best interests of a child, courts must analyze (1) the child's interests in preserving the parent-child relationship, (2) the parent's interests in preserving the parent-

17

child relationship, and (3) any competing interests of the child. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. This court reviews a district court's determination that termination is in a child's best interest for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

Mother argues that "the district court abused its discretion by finding that a termination of [her] parental rights was in the best interest of the children" because "the children and [mother] had an interest [in] preserving [the] parent child relationship, and [she] was well positioned to provide the children with a safe and stable home environment."

The district court found that the children reported an interest in maintaining contact with mother through visitation, but did not want to return to mother's care. It also found that mother has an interest in preserving the parent-child relationship with the children, as documented by her compliance with certain aspects of her case plan and statements that she made to service providers. However, the district court determined the children's competing interests outweighed mother's interest in preserving the parent-child relationship.

The district court reasoned that the children "need a parent that can protect them, teach them appropriate boundaries, and keep them safe," the children have serious mental-health and behavioral issues that require additional care and attention, and mother has not demonstrated that she understands her children's mental-health and behavioral needs and

18

can successfully parent them. The district court further reasoned that because mother has failed to display the proper protective capacity after nearly a year and a half of parenting services, it is unlikely that she will do so in the reasonably foreseeable future and thus "[i]t is not in the children's best interests to give [mother] any additional time to participate in services, work her case plan, or attempt to make the changes necessary to correct her parenting deficiencies." The district court therefore concluded that it is not in the best interests of M.H.S. or K.S. to be reunified with mother and that termination of mother's parental rights was in the children's best interests.

The district court's best-interests findings are supported by the record, and its best-interests analysis is thorough. As the district court noted, the children need a parent who understands the impact of their past trauma, can protect them from being re-victimized, and can meet their special needs. There is no question that mother loves the children. But the record indicates that at the time of trial, mother had not demonstrated an ability to protect the children, to understand and meet their mental-health and behavioral needs, or to adequately address her own mental-health needs and their impact on her parenting ability. And the record further demonstrates that these conditions were not likely to change in the reasonably foreseeable future. The district court did not abuse its discretion in determining that termination of mother's parental rights is in the best interests of the children.

**Affirmed.**