*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0142
A25-0425**

In re the Marriage of:

Laura Marie Knutsen, petitioner,
Appellant,

vs.

Peder Nels Knutsen,
Respondent.

**Filed June 22, 2026
Affirmed in part, reversed in part, and remanded.
Jesson, Judge**[*]

Hennepin County District Court
File No. 27-FA-21-4113

Seungwon R. Chung, DeWitt LLP, Minneapolis, Minnesota (for appellant)

Sam Khoroosi, Jessica Sampson, Khoroosi Law Office, P.A., St. Louis Park, Minnesota
(for respondent)

        Considered and decided by Johnson, Presiding Judge; Bond, Judge; and Jesson,

Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

**JESSON**, Judge

After 30 years of marriage and three children, appellant Laura Marie Knutsen filed a petition for dissolution of marriage from respondent Peder Nels Knutsen.[1]  Over four years of litigation later, their case arrives here.  Laura alleges that the district court (1) made multiple errors in calculating the distribution of marital property, (2) incorrectly determined Laura's spousal maintenance award, and (3) abused its discretion by denying her request for need-based attorney fees.  Peder filed a notice of related appeal, arguing that the district court abused its discretion in the amount it granted Peder in conduct-based fees and in its valuation of the couple's Florida property.

We affirm the district court's decision as to the valuation and forced sale of the Florida property, each parties' request for attorney fees, and parts of the allocation of marital assets.  However, we reverse the district court's award of spousal maintenance to Laura and parts of the court's allocation of martial assets.  Accordingly, we affirm in part, reverse in part and remand.

## FACTS

Laura and Peder were married in 1991, and have three children who, at the time of the proceedings, were all over 18 years old.  Laura filed a petition for dissolution of

---

[1] Because they share the same last name, we refer to Peder and Laura Knutsen by their first names throughout the rest of this opinion.

marriage in Minnesota in August 2021.  The district court eventually ordered October 12, 2021, as the valuation date for the proceedings.[2]

### *Events leading up to dissolution*

At the time of their marriage, Laura worked as a financial planner and Peder was enrolled in medical school at the University of Minnesota studying to become an anesthesiologist.  While Peder was in school, Laura supported the family but in 2003 left her career to stay home and raise the children.  Peder completed his residency in 1998 and joined Midwest Anesthesiologist, P.A. (MAPA),[3] becoming a shareholder and president of the organization in 2001.  The MAPA stock purchase agreement (buy-sell agreement) required a buy-in of $5,000 for shareholders, which Peder paid for his shares.

While at MAPA, Peder helped to expand the business by securing exclusive contracts while Laura assisted by hosting numerous social events for the shareholders and maintaining the family home while Peder worked.  Peder's annual income at MAPA varied but at times was over $1 million.

In 2015, Laura and the three children moved first to Florida and then to Oklahoma because of the children's increased educational needs and their involvement in prestigious tennis training academies.  Peder continued to reside in the family home in Minnesota but visited the family about a week each month or whenever he had a vacation from work.  Throughout the marriage, both parties enjoyed a high standard of living.  Laura was

---

[2] We take the following facts from the record of the trial and other relevant proceedings before the district court.

[3] MAPA is a group of physicians that offer medical services to hospitals, clinics, and other locations.

responsible for the family's finances during the marriage and was in charge of building another family home in Naples, Florida, and then in Tulsa, Oklahoma, with both construction projects eventually going over budget by hundreds of thousands of dollars. Laura testified at trial that the parties had expensive country club memberships during the marriage and that her hobby was buying designer clothing. Throughout this time, the family accumulated a significant amount of debt.

After time apart and significant financial pressure, the marriage eventually broke down. In July 2021, Peder commenced a divorce action in Tulsa, Oklahoma, where Laura and the children were living. Before service could be completed, Laura commenced a marriage-dissolution action in Minnesota in August 2021. Over the next two years, litigation ensued regarding proper jurisdiction for the divorce proceedings. Jurisdiction was eventually transferred to Minnesota in April 2023.

During this time, Peder left his employment at MAPA and began working at South Valley Anesthesia P.A. (South Valley). Peder testified that he was burned out by his time at MAPA and that he stepped down because he was facing pressure from other shareholders about the future of the business. He explained that he sold his shares back to the company at the buy-sell price of $5,000 and then used that money to buy in as a shareholder at South Valley. Peder also owns 200 shares of Health Billing Systems (HBS), which is the billing company used by anesthesiologist groups such as MAPA and South Valley.

*Trial Proceedings Regarding Property Division*

The parties appeared for a trial on the dissolution in June 2024. Each testified about the marital assets and debts claimed by each side,[4] each party's monthly income and expenses, and the valuation of their Florida property. Both Peder and Laura raised multiple arguments at trial, including how to value Peder's business; multiple allegations of dissipation of marital assets; and how to value the Florida property.

## Business Valuation

Each party presented expert witness testimony regarding the valuation of Peder's business at trial. Laura's valuation expert estimated MAPA's value at $970,000 and HBS's value at $311,000 based on a hypothetical sale to a third party and not the buy-sell agreement. Peder estimated that the value of his MAPA share was worth $5,000 per the buy-sell agreement as that is what his shares were ultimately sold for, and that the value of his HBS share was worth $180,000. Peder's expert testified that he used the buy-sell agreement to determine valuation because it was more reflective of the company's actual value and that MAPA "has strictly adhered to the buy-sell agreement for the last two years." He also noted that Peder did not have a controlling share of MAPA, could not force a sale of the company, and that the rest of the group at MAPA was not willing to sell the company.

---

[4] Marital assets are those gained during the marriage that are to be split equitably by the district court between the parties upon dissolution of the marriage. Minn. Stat. § 518.003, subd. 3b (2024). Nonmarital assets are those acquired before the marriage, by one party during the marriage as a gift or inheritance, after the valuation date, or precluded from consideration as part of the marital estate by a valid antenuptial agreement. *Id.* Nonmarital assets are not divided between the parties upon dissolution.

**Dissipation-Related Issues**

Several issues raised at trial—and on appeal—relate to Peder's claims about Laura's spending during, or shortly before, the dissolution proceedings. This included Laura allegedly obtaining a fraudulent mortgage on the Oklahoma home that sold prior to trial; that Laura's refusal to file taxes jointly in 2022 and 2023 led to tax fines assigned to Peder; and that Laura dissipated certain marital funds through purchase of cashier's checks and a Porsche Cayenne. Laura also claimed that Peder's expert double counted some of her funds and incorrectly categorized debt.

With regard to the mortgage issue, it is undisputed that in August 2021, Laura took out a second mortgage on the couple's Tulsa, Oklahoma home for $249,000. Laura testified that she and Peder had talked about taking out the second mortgage; however, Peder testified that the mortgage was fraudulently obtained and that he believed Laura had one of their sons forge his signature on a power of attorney document for Peder so she could obtain the loan without Peder's knowledge. Peder eventually discovered Laura had deposited the second mortgage funds into her personal account with TTCU Federal Credit Union (TTCU). After learning of the mortgage, Peder filed a police report and a report with the FBI for mortgage fraud.

Laura claimed the funds she received for the second mortgage were used to pay household bills; however, Peder requested that the $208,440.60 in Laura's personal TTCU account be counted as marital property as those funds are attributed to the second mortgage. Laura testified that TTCU brought suit against her for the mortgage amount and she had to

borrow $242,809 from her parents to satisfy the loan and that the amount should be included on the court's balance sheet as a marital debt.[5]

Turning to the tax issue, according to Peder's testimony, he incurred $52,209 of tax debt because Laura filed her 2022 and 2023 taxes as married filing separately, whereas he filed a joint tax return. Peder requested that the district court order Laura to amend her tax returns for 2022 and 2023 as filing jointly so they "don't incur $100,000 of marital dissipation." Peder then stated that, "in the alternative," if the district court was unwilling to order Laura to amend her tax returns, "that the Court order [her] to reimburse [him] for the shortfall in 2022 and 2023."

Peder also alleged that Laura dissipated marital funds three additional times throughout the dissolution proceedings. Peder first testified that, on February 18, 2021, Laura took out a cashier's check from the parties' joint Well Fargo account for $50,000 and transferred it to her own personal account. Laura testified that the money was put into the couple's joint account in Tulsa. Second, Laura withdrew another $55,000 from their joint account on May 17, 2021, that Peder stated he intended to use to pay their tax debt. Laura said that the $55,000 was used to pay basic family expenses and that she deposited it, in addition to the previous $50,000, into one of the parties' joint accounts. The final dissipation claim was for the Porsche Cayenne that Laura purchased in 2020. Laura testified that she and Peder discussed buying the Porsche and that it was an appropriate

---

[5] Minnesota courts recognize and routinely use balance sheets in marriage dissolution proceedings as financial documents that list the parties' total assets and liabilities to determine net worth available for equitable distribution.

7

purchase because it was typical of the cars that she and Peder drove throughout their marriage.

At trial, Laura's expert also testified about the marital and nonmarital asset amounts presented by each party at trial and the differences or mistakes in Peder's asset reports, particularly those related to the TTCU mortgage and the dissipation claims. When asked about Laura's personal Bank of America (BOA) account, her expert noted that the account was not opened until December 2021, making it a post-valuation-date account. He stated that the $70,500 in the BOA account came from the TTCU savings account that listed a $208,440 figure, and that by including both assets in the balance sheet, it was double-counting the funds. He also noted multiple times where Peder's balance sheet double-counted funds on Laura's behalf in regard to the dissipated funds: that the $50,000 cashier's check that was taken out of the Wells Fargo account on February 18, 2021, was then deposited into the couple's shared Vast Bank account; that the $55,000 for 2020 tax payments was also deposited into the parties' Wells Fargo account; and that the value of the Porsche was already assigned to Laura, so including dissipation funds for the same asset was essentially double-counting her marital property.

**Florida Property**

In addition to the business valuation and dissipation issues, the parties disagreed on the value and the sale of the Florida property. Laura's appraiser valued the property at $417,000 using the valuation date and comparing sales in the same neighborhood of the property to determine value after adjusting the amount to account for differences in age, view, square footage, and rooms. Peder's appraiser did not consider any of the property

8

values in the immediate neighborhood and instead looked to properties in different neighborhoods, some "several miles away" that were in different gated communities with different amenities. Peder's appraiser valued the property $825,000 using May 20, 2022, as the valuation date without explaining why the October 12, 2021, valuation date was not used. Peder requested to sell the property and split the proceeds; however, Laura wished to be awarded the property.

***Trial Proceedings Regarding Spousal Maintenance***

When asked about spousal maintenance, Laura testified that she was concerned about her ability to earn a living after being out of the workforce for over two decades and that without a college degree it would be difficult for her to find adequate employment. Besides the temporary spousal maintenance ordered by the court and any future potential employment, Laura reported no other source of income. Laura presented a detailed spending analysis to the court that spanned 273 pages and included a proposed budget of $25,842/month. Laura requested between $21,000 and $22,000 in monthly spousal maintenance.

In regard to his income concerning a maintenance award, Peder testified that in addition to his employment at South Valley, he was working part time at Mayo Clinic due to the extra expenses of the dissolution proceedings and the overspending he and Laura participated in during their marriage. He stated that it was not the marital standard for him to work two jobs and requested the district court issue an order that did not force him to continue working a second job. Peder requested the court issue Laura a spousal maintenance award of $10,000/month for 60 months. Peder presented a proposed budget

9

that included payment for his and Laura's adult children's college expenses at $7,000/month with a total monthly budget of about $41,000.

### *District Court's Judgment and Decree*

The district court entered its final, amended judgment and decree in November 2024.[6]  In the final assignment of marital assets, the district court awarded $722,673 to Laura from Peder's retirement accounts as a pre-tax retirement equalizer and ordered that Laura pay Peder $270,863 as a cash equalizer.  The district court noted that the amount "shall be paid out of [Laura's] share" of the Minneapolis home or the Florida home and that, until it was paid, Peder had a marital lien against her for that amount.

### **Business Valuation**

To reach these valuation amounts, as relevant on appeal, the court found Peder's expert credibly valued his MAPA shares at $5,000 and his HBS shares at $180,000.  The district court noted that Peder already "realized the full benefit of his [MAPA] shares," the amount was controlling, and the HBS valuation was persuasive because, in the last ten sales of HBS stock, 200 shares—which is the number of shares Peder owned—were purchased for $180,000.  The district court also concluded in its order that a portion of Peder's bonuses from 2021 would be used to adjust his proposed balance sheet in the amount of $81,714 and $14,167 as after-tax marital payments, and for $34,808 in property

---

[6] The district court filed its initial order directing entry of a judgment and decree of dissolution in October 2024.  The district court entered an amended judgment and decree correcting clerical errors later that month, and again in November 2024.

taxes for the Oklahoma home as an adjustment to Peder's assets. However, these amounts did not appear on the court's final balance sheet.

### Dissipation Issues

As for the allegations of dissipation and mishandling of funds, the district court assigned $208,440 to Laura as marital funds for the fraudulently obtained mortgage and assigned her the loan from her parents to pay the mortgage as her nonmarital debt.[7] The court ordered Laura to amend her tax returns for the years 2022 and 2023 to file jointly so as to cure the fines awarded to Peder and also assigned tax debt to Peder in marital funds equaling $102,000 ($52,209 for 2022 and $50,000 for 2023). The order assigned an additional $140,000 to Laura as marital property in dissipated funds: $50,000 for the cashier's check, $55,000 for the tax payment, and $35,000 for the Porsche down payment. Both Laura's BOA and TTCU account assets were also included as Laura's marital property on the final balance sheet.

### Florida Property

Regarding the Florida property, the court found that Laura's $417,000 valuation was a more reasonable value for the property and that the home "should be promptly placed for sale" but that Laura could purchase the property from Peder if she wanted to retain it for

---

[7] Though the district court noted in its findings that the debt amount from the mortgage was Laura's nonmarital debt, the amount listed on the balance sheet is $133,225, which appears to be from a prior debt owed to Laura's parents that Laura and Peder borrowed in 2019 to finish construction on their Oklahoma home. Laura testified that they borrowed $100,000 during the marriage and that, with interest, the loan amount is now equal to $133,225 and should be calculated as marital debt between the parties. This issue is further discussed below.

her residence.  The district court gave Laura 60 days from the date of entry of judgment to close on a purchase for the price of the home.

**Maintenance**

In addition to the findings related to property division, the district court addressed the factors to determine spousal maintenance, pursuant to Minnesota Statutes section 518.552, subd. 1 (2024).  In its order, the court noted the vocational evaluator's determination that Laura was fit for employment such as a bank teller, that she could earn $37,024 per year, and that she could increase her earnings to $41,600 within two years.  The court found it appropriate to impute income to Laura in the amount of $40,000 per year and that, based on that amount, Laura was still in need of spousal support to meet her needs.  The court also found that Peder had a gross monthly income of $28,686, based on Peder's exhibit of his net monthly cash flow, entered at trial.  Because it was "not the marital standard of living" for Peder to work two jobs, the district court concluded that the Mayo Clinic income would not be considered for purposes for spousal maintenance.

In its findings, the court stated that the parties enjoyed a high standard of living during the marriage and that Peder was unaware of the extent of the family's financial troubles during the marriage, that Laura was in charge of the family's finances throughout the marriage, and that she was responsible for building the marital homes in Florida and Oklahoma which both went well over budget.  The court noted that Laura knew about the family's spending outpacing their income but that she "chose to ignore it" and continued to "spend lavishly" instead of alerting Peder to their financial troubles.  In analyzing the standard of living, the court included consideration of Laura and Peder's adult children's

12

college tuitions and that Peder testified that he intended to pay the college expenses. The court considered Peder's ability to pay, and Laura's potential employment, age, and conduct in "depreciating the marital estate" when determining an award amount.

The district court determined Laura's monthly expenses amounted to $10,612 and included a breakdown of each of her expenses. The order found that Peder's expenses amounted to $41,000 but provided no detailed breakdown of said expenses, citing only to an exhibit in the record that showed Peder's monthly net cash flow—his South Valley and HBS income minus the proposed maintenance award, retirement contributions, and tax payments. The court noted the children's education cost would be factored into Peder's budget for maintenance purposes, which was not included in the cited exhibit, and awarded Laura $12,000/month in spousal maintenance. The following chart summarizes the district court's income decisions regarding maintenance, in pretax dollars.

|  | Peder | Laura |
|---|---|---|
| Income | $737,786 (South Valley Anesthesia) | $41,600 (Imputed income) |
| Less: retirement-account contributions | ($15,980) | - |
| HBS distributions | $103,553 | - |
| Maintenance payments | ($144,000) | $144,000 |
| **Total cash income** | **$681,359** | **$185,600[8]** |

---

[8] This portion of the exhibit, cited by the district court, is updated with the accurate spousal maintenance amount awarded to Laura based on the court's final order.

**Attorney Fees**

Turning to attorney fees, the district court awarded Peder conduct-based attorney fees. The court found that throughout the proceedings, Laura's actions "made things more complicated and expensive than they would have been if she had acted in good faith" and that her "duplicitous and disingenuous conduct has substantially increased the length and expense of this proceeding." The court directed Peder to submit an attorney-fee affidavit within 14 days of the order. The district court then denied Laura's request for need-based attorney fees.

Following filing of the district court's order, Peder's attorney filed an attorney-fee affidavit to illustrate his attorneys' fees and costs related to the dissolution due to Laura's alleged misconduct throughout the proceedings. Peder requested $250,000 of conduct-based attorney fees from the district court. The district court filed an order in January 2025, awarding Peder $990 in conduct-based fees. The next month, the court ordered the Florida property sold because Laura failed to purchase the property before the stated deadline, although that order and payment of the equalizer were stayed by the district court pending appeal.

Both parties assert challenges to the district court's judgment on appeal.

## DECISION

Laura argues the district court abused its discretion by (1) improperly dividing marital property; (2) improperly determining spousal maintenance; and (3) denying her request for need-based attorney fees. Peder argues on notice of related appeal that the

14

district court abused its discretion both by undervaluing the Florida home and by awarding him minimal conduct-based attorney fees. We address each argument in turn.

## I. The district court erred in dividing some of the parties' marital property.

With certain exceptions, property acquired by husband and wife—or either of them—during their marriage, but prior to the date of valuation, constitutes "marital property." Minn. Stat. § 518.003, subd. 3b. Marital property is to be divided equitably, not necessarily equally, upon dissolution of a marriage. *See* Minn. Stat. § 518.58, subd. 1 (2024) (requiring the district court to "make a just and equitable division of the marital property of the parties" based on "all relevant factors" and considering "the contribution of each in the acquisition, preservation, depreciation or appreciation in the amount or value of the marital property"). A district court has broad discretion in this division and its decision will not be reversed absent a clear abuse of discretion. *Bogen v. Bogen*, 261 N.W.2d 606, 609 (Minn. 1977); *accord. Antone v. Antone*, 645 N.W.2d 96, 100 (Minn. 2002). Determining the value of an asset is a finding of fact we review for clear error. *Maurer v. Maurer*, 623 N.W.2d 604, 606 (Minn. 2001). And in reviewing property evaluation findings, we require only that the valuation falls within a reasonable range of figures. *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn. 1979) (citing *Hertz v. Hertz*, 229 N.W.2d 42, 44 (Minn. 1975)). But whether a property is marital or nonmarital is a question of law, which we review de novo, while deferring to a district court's factual findings. *Olsen v. Olsen,* 562 N.W.2d 797, 800 (Minn. 1997).

Here, Laura asserts that the district court erred in dividing the couple's property, resulting in a miscalculation that "took over half a million dollars from her share of the

15

estate." Laura argues that the district court (1) clearly erred in valuing Peder's business using the buy-sell agreement; (2) improperly attributed mortgage proceeds to her as a marital asset; (3) double-counted her bank-account balance and Peder's tax debt while omitting other assets; (4) misapplied the dissipation statute; and (5) abused its discretion by forcing a sale of the Florida property. Peder argues that the district court clearly erred in its valuation of the Florida property.

### A. The district court did not clearly err in valuing Peder's business shares using the buy-sell agreement.

Laura argues the district court clearly erred in valuing Peder's business shares because it ignored the fair market value of Peder's businesses and adopted the buy-sell prices instead, whereas her expert followed the law by assuming a sale of the entire business and a willing buyer.

Minnesota courts have relied on different methods for calculating the value of different businesses. *Nardini v. Nardini*, 414 N.W.2d 184, 189-90 (Minn. 1987) (using eight factors to determine a "reasonable valuation" for a closely held corporation). One such method is a buy-sell agreement. *See Nelson v. Nelson*, 411 N.W.2d 868, 872 (Minn. App. 1987) (using three methods to value a service-based business: (1) adjusted book value, (2) capitalization of income, and (3) a buy-sell agreement). No one method is suitable for every situation, and each requires consideration of factors that can affect the

accuracy of the valuation. *Prevost v. Prevost*, No. A13-1320, 2014 WL 1344312, at *3 (Minn. App. Apr. 7, 2014).[9]

Here, the district court found Peder's expert credible regarding the valuation of Peder's MAPA and HBS shares. The court determined that, since there was not a willing buyer for his MAPA shares and Peder already sold them for $5,000, that amount was controlling. The district court also found that the $180,000 valuation of HBS was persuasive because the purchase history of HBS shares for the previous ten years corroborated this value.

We discern no clear error in this evaluation. The district court heard testimony from both parties' experts regarding valuation of Peder's businesses and determined the proper valuations for Peder's businesses. And where expert witnesses offer conflicting opinions that each have a reasonable basis in fact, it is the responsibility of the trier of fact to determine which opinion is more credible, and that determination will not be disturbed on appeal. *Griepp v. Griepp*, 381 N.W.2d 865, 869 (Minn. App. 1986). The difference between expert witnesses' valuations is "inescapably a credibility issue." *Bury v. Bury*, 416 N.W.2d 133, 137 (Minn. App. 1987). Therefore, we affirm the district court on this issue.

To persuade us otherwise, Laura cites *Rogers v. Rogers*, 296 N.W.2d 849, 852 (Minn. 1980), to assert that a buy-sell agreement is "not dispositive." However, the question in *Rogers* was related to the court's valuation of an ongoing closely-held marital

---

[9] Nonprecedential opinions are not binding authority but can be cited for their persuasive value. Minn. R. Civ. App. P. 136.01, subd. 1(c).

17

business, which required estimation. 296 N.W.2d at 852. The husband in *Rogers* owned 85% of a business that was essentially a one-person operation, and he continued to own and operate the business after the marital dissolution. *Id.* at 851. Here, unlike in *Rogers*, the valuation is not for a closely-held marital business. Nor did Peder own a majority of the business. Peder owned a noncontrolling portion of MAPA shares and would not have been able to force a sale of the business. *See Petterson v. Petterson*, 366 N.W.2d 685, 688 (Minn. App. 1985) (distinguishing *Rogers* because husband lacked the ability to modify the buy-sell agreement, there was no other market for the husband's stock, and there was no evidence before the trial court that the buy-sell agreement could be modified). In light of the facts of this case and the actual price Peder received for the MAPA shares, the district court's valuation is not clearly erroneous.

**B.    The district court did not clearly err in attributing the value of the second mortgage to Laura as marital property.**

Laura asserts that the district court clearly erred by finding she had over $208,000 in her bank accounts attributable to the proceeds of the second mortgage on the Oklahoma home, but "ignored the almost $250,000 debt that funded it." If the court determined that the loan proceeds were marital property, Laura contends, so should the debt (the loan from her parents to pay off the mortgage) be marital debt. Further, she claims that Peder was aware of the second mortgage on the Oklahoma home and that the district court's finding that she fraudulently procured the loan is clearly erroneous and should be reversed.

The second mortgage on the Oklahoma home was procured six days before Laura petitioned for dissolution of marriage. As a result, Minnesota law imposes a fiduciary duty

18

"for any profit or loss derived by the party, without the consent of the other, from a transaction or from any use by the party of the marital assets." Minn. Stat. § 518.58, subd. 1a. If the court finds that a party (here, allegedly Laura) has acted without the consent of the other party in so doing, it shall compensate the other party. *Id.* The statute states as follows.

> [I]n *contemplation of commencing, or during the pendency of, the current dissolution*, separation, or annulment proceeding, transferred, *encumbered*, concealed, or disposed of *marital assets except* in the usual course of business or *for the necessities of life*, the court shall compensate the other party by placing both parties in the same position that they would have been in had the transfer, encumbrance, concealment, or disposal not occurred.

*Id.* (emphasis added).

Here, the district court found the second mortgage for the Oklahoma home was fraudulently obtained by Laura. While there was competing testimony on whether Peder consented to the second mortgage, the court found Peder, not Laura, credible on this issue. It then applied the statute and concluded that Laura breached her fiduciary duty to Peder by encumbering the Oklahoma home. As a result, it awarded the debt from Laura's parents to Laura as non-marital debt.

We affirm the district court's assessment: both the finding that the loan was not consented to and the attribution of the loan as an individual obligation pursuant to the statute. The district court is in the best position to determine credibility, *see In re Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn. 1995) (noting that the district court stands in a superior position in assessing credibility of witnesses), and upon finding Peder's

19

testimony credible, the court properly assigned the debt for repayment of the mortgage loan as Laura's nonmarital debt. *See* Minn. Stat. § 518.58, subd. 1a (stating that, in dividing marital property, the court "may impute the entire value of an asset and a fair return on the asset to the party who transferred, encumbered, concealed, or disposed of it").

While the district court did not err in attributing the debt on the mortgage to Laura, it appears that the $133,225 nonmarital debt on the court's final balance sheet does not pertain to the mortgage loan,[10] but instead to the 2019 construction loan Laura's parents gave Peder and Laura for their Oklahoma property. That separate construction loan should have been categorized as marital debt. As a result, while we direct the district court to add the 2019 $133,225 obligation as marital debt on the balance sheet, we conclude the district court did not clearly err in finding the debt funding the $208,440 second mortgage of the Oklahoma home to be Laura's nonmarital debt.[11]

**C.** **The district court clearly erred by double-counting Laura's marital assets and Peder's tax debts, and by failing to adequately account for certain assets in the division of marital property.**

Laura argues that the district court double-counted some of her assets by counting the amount of a bank account that was opened after the valuation date, miscounted some of Peder's tax debts, and omitted other assets. We address each issue below.

---

[10] The loan for the Oklahoma property mortgage was $208,440.
[11] However, the nonmarital debt amount for the Oklahoma mortgage does not affect the overall calculation of marital property because it is only assigned to Laura.

20

***Bank of America Account***

Laura first asserts that the district court "captured the value" of her Bank of America (BOA) account twice because the account did not exist "on the valuation date and . . . had a balance of $70,500 several months later," which the district court then included in its balance sheet determining the couple's marital property. Laura claims that these funds were transferred from her TTCU account, which had a $208,440 value before the transfer, and that, since the court counted both the TTCU account at $208,440 and the BOA account at $70,500, it counted the $70,500 amount twice.

The record supports Laura's assertion. Bank statements show that, on the valuation date, the TTCU account did in fact have an amount of $208,440.60. The district court also notes in its order that the BOA account was opened after the valuation date of October 12, 2021. The district court found that Peder "includes the $70,500 in [Laura's] account on December 20, 2021, on his balance sheet" but does not explain why this would be included in the marital property as it was opened after the valuation date. In addition, the record shows that $75,000 was removed from the TTCU account on December 30, 2021, and that $500 was deposited into the BOA account on December 20, 2021, with another $70,000 on January 3, 2022, all well after the valuation date.

Still, Peder asserts that the district court has "discretion in determining the value" of Laura's accounts and the valuations of marital property "need not be exact" but "must only lie within a reasonable range of figures." *Johnson*, 277 N.W.2d at 211. However, generally, nonmarital property includes what was acquired after the valuation date, Minn. Stat. § 518.003, subd. 3b, and the district court's use of an incorrect figure when

21

dividing the marital property is an abuse of discretion. *Blessing v. Blessing*, No. A21-1709, 2023 WL 1093864, at *6 (Minn. App. Jan. 30, 2023) (remanding the district court's judgment "for correction" because the court double-counted an asset when calculating petitioner's marital assets and "[s]uch double counting constitutes an abuse of discretion").

In sum, while exactitude is not required in asset evaluation, in this case an additional $70,500 is not within a reasonable range of figures and amounts to clear error. Nor does the scope of the district court's discretion allow it to count the same asset twice when, over time, the record shows that the asset simply moved from one point in a marital estate to another point in the estate, here from one account to another. This $70,500 error has a substantial effect on Laura's equalizer amount. Accordingly, we remand for the district court to remove the BOA account from the balance sheet.

### Tax Debts

Laura also asserts that the district court improperly double-counted the division of tax debt in its order. The district court assigned $50,000 in tax debt to Peder for 2023 and $52,209 for 2022 because Laura filed her tax returns as married filing separately, which created separate filing costs for Peder. But the district court also ordered Laura to amend her returns for those years to reflect a joint filing status.

While the decision to require the parties to file a joint tax return is a question of property division within the district court's broad discretion, *Theroux v. Boehmler*, 410 N.W.2d 354, 356 (Minn. App. 1987), the district court did not explain why Peder would still be responsible for the tax debts if Laura amends her 2022 and 2023 filings. And we note that, at trial, Peder requested that the district court order them to file joint tax returns

22

for 2022 and 2023 *if* the district court was unwilling to order Laura to amend her tax returns and order her to reimburse Peder.

In sum, Laura could be responsible for the tax debt by amending her tax returns *or* by paying for the relevant amounts through the equalizer. The district court erred in assigning the 2022 and 2023 tax debts to Peder *and* ordering Laura to amend her tax filings for those years. We remand to the district court to amend its final order to either assign the 2022 and 2023 tax debts to Peder or order Laura to amend her tax filings, but not both.

### Other Omitted Assets

Laura also argues that the district court erred by ignoring Peder's bonuses when assigning marital property and failing to adjust for property taxes that were Peder's responsibility. She asserts that the district court agreed that Peder's bonus amounts equaling $95,881, and the $34,808 in property taxes Peder was responsible for, should have been included on the final balance sheet.

Because we have determined that a "bonus is a marital asset which should" be divided by the lower court, *In re Marriage of Steffan*, 423 N.W.2d 729, 733 (Minn. App. 1988), and the district court stated in its findings that the bonus amounts were in fact "marital payments," we are unsure why the district court did not include the bonuses on the final balance sheet. Based on the record, it appears the district court failed to include the bonus and property tax amounts on the balance sheet and did not explain in its order why the amounts were omitted. We remand for further explanation by the district court regarding the omission of the amounts for the bonus and property tax stated in its order and for any appropriate adjustments.

23

**D.** **The district court partially erred in finding Laura dissipated marital funds.**

Laura argues that the district court erred by crediting her with $140,000 in dissipation "for simply transferring money between marital accounts or buying an asset included elsewhere." She argues that, because the $55,000 withdrawal was used for family expenses, the $50,000 withdrawal was put into a joint bank account, and the Porsche payment was not a dissipation of funds, these items should be removed from the district court's final balance sheet.

As noted above, Minnesota law prevents parties to a pending marriage dissolution from dissipating marital property without the consent of the other party in contemplation of or during a dissolution. Minn. Stat. § 518.58, subd. 1a. Dissipation of marital assets is a question of fact and we review the district court's decision on factual questions for clear error. *Id.* ("If the court *finds* . . . ." (emphasis added)). And the party alleging dissipation has the burden of proof. Minn. Stat. § 518.58, subd. 1a.

*$55,000 Tax Amount*

Laura claims that she withdrew $55,000 from the marital funds in May 2021 for "basic family expenses for [herself] and the kids." However, the district court determined that Laura's testimony was not credible and that the $55,000 transfer to her own account qualified as dissipation.

While Laura cites an exhibit in the record that shows the transfer of the funds into her Wells Fargo account and then a transfer of $26,373.07 to a platinum card and $10,000 to an American Express card, she does not explain how that establishes that the district

24

court clearly erred by not finding that she used the $55,000 for basic family expenses. As we do not reassess credibility of witnesses on review and the district court is in the position to judge the credibility of the evidence and testimony, *see In re Welfare of A.D.*, 535 N.W.2d at 648, we conclude that the district court did not clearly err in its determination that this transfer constituted dissipation of assets.

### *$50,000 into Joint Account*

Laura also challenges the district court's dissipation finding for the $50,000 cashier's check that Laura withdrew in February 2021. She claims this amount went from "one joint account to another" and that she merely withdrew the $50,000 and put it into the Vast Bank account that was used for family expenses. Peder claims that Laura transferred these funds into her personal account but cites nowhere in the record to support this assertion.

The record shows that $49,000 was deposited into the Vast Bank account on March 3, 2021. The Vast Bank account is a joint account, and therefore marital property.[12] As a result, the district court did clearly err in assigning $50,000 to Laura for dissipated funds for the cashier's check and we remand to remove those funds from the balance sheet.

### *Porsche Amount*

Regarding the final dissipation claim, Laura argues that the district court erred by assigning her the value of the Porsche as marital property because the court did not make any findings that she bought the Porsche in anticipation of the divorce.

---

[12] The district court lists the Vast Bank account as marital property on the final balance sheet.

The relevant part of the standard for a finding of dissipation of funds is not financial hardship but "in contemplation of commencing, or during the pendency of, the current dissolution." Minn. Stat. § 518.58, subd. 1a. The district court made no such finding regarding Laura's purchase of the Porsche. Instead, the court found that Laura purchased the Porsche without informing Peder at a time they were concerned about their future income. But the Porsche was purchased in December 2020, well before the valuation date or the dissolution proceedings began in the summer of 2021. Laura also testified that buying the Porsche was in line with the parties' lifestyle at the time and their prior car purchases, which included a 2017 Audi Q7. Therefore, we remand to the district court to remove this amount from the balance sheet or to support its conclusion with further findings.

**E.** **The district court did not clearly err in its valuation of the Florida property or abuse its discretion in directing its sale.**

Finally, both parties challenge the district court's handling of the Florida property. Peder asserts that the district court clearly erred in valuing the Florida property at $417,000 and should have adjusted the value for market-based gains and losses. In contrast, Laura contends that a forced sale of the property may be unnecessary if this court finds error in the district court's marital property calculation so that her ability to purchase the property could be more plausible.

*Valuation*

We begin with the district court's valuation of the Florida property. The value of an asset is a factual finding that we will not set aside unless it is clearly erroneous. *Maurer*,

623 N.W.2d at 606. A finding is clearly erroneous if it is against the weight of the evidence or not "reasonably supported by the evidence as a whole." *Kiya v. Jackson*, 23 N.W.3d 857, 863 (Minn. App. 2025), *rev. denied* (Minn. Aug. 21, 2025). We uphold a district court's valuation if it falls within a range of credible estimates and does not need to coincide with any one estimate. *Maher v. Maher*, 393 N.W.2d 190, 193 (Minn. App. 1986).

Here, the district court heard testimony from both parties' experts at trial as to the valuation of the Florida property and found that Laura's expert properly used the valuation date to determine value of the property, while Peder's expert used a date in May 2022 "without explanation as to why." Laura's expert compared other house sales in the same neighborhood when determining the value of the property, whereas Peder's expert compared homes outside of the neighborhood, some even "several miles away" and in different gated developments with different amenities. Based on the record, the district court properly found that Laura's valuation was reasonable and more credible. We affirm the district court's valuation of the Florida property.

### Forced Sale

While a district court must make a "just and equitable division" of marital property by considering, among other things, each spouse's contributions to the property's value, Minn. Stat. § 518.58, subd. 1, this court does not disturb an appropriate order to enforce the terms of a decree. *See Nelson v. Nelson*, 806 N.W.2d 870, 871 (Minn. App. 2011) (concluding that a district court may issue an order to enforce the provisions of a decree so long as it does not change any substantive rights). The district court has the authority to

order the sale of a marital homestead "upon the issuance of a final decree of marriage dissolution." *Melamed v. Melamed*, 286 N.W.2d 716, 718 (Minn. 1979).

Here, the district court gave Laura 60 days after the order for judgment was filed to purchase the Florida property if she desired to keep it. Though Laura claimed that she had a private equity investor willing to purchase the home for her, those funds never materialized and she did not make the purchase. Because the district court has authority to order the sale of marital property, we see no abuse of discretion in ordering the sale of the Florida home.

## II.    The district court abused its discretion in calculating Laura's spousal maintenance award.

Laura next argues that the district court abused its discretion in determining her spousal-maintenance award while Peder contends that the court properly assigned spousal maintenance based on a reasonable standard of living compared to the inflated spending the parties participated in during the marriage.

Spousal maintenance means "payments from the future income or earnings of one spouse for the support and maintenance of the other." Minn. Stat. § 518.003, subd. 3a (2024). A party must show need to receive an award of spousal maintenance, which is appropriate when a spouse cannot "provide for reasonable needs" or "is unable to provide adequate self-support." Minn. Stat. § 518.552, subd. 1(a)-(b) (2024); *Honke v. Honke*, 960 N.W.2d 261, 266 (Minn. 2021). We review a district court's decision concerning the amount and duration of an award of spousal maintenance

for an abuse of discretion. *Erlandson v. Erlandson*, 318 N.W.2d 36, 38 (Minn. 1982); *Schmidt v. Schmidt*, 964 N.W.2d 221, 226 (Minn. App. 2021).

The district court awarded Laura $12,000/month in spousal maintenance based on her potential earning ability and Peder's proposed monthly budget of $41,000. In the court's calculation, it did not include Peder's Mayo Clinic income as part of his monthly net cash flow because it was not the marital standard of living for Peder to work two jobs. But the district court did include the children's college tuition as part of Peder's expenses when awarding maintenance.

First, we conclude that the district court acted within its discretion when it declined to use Peder's Mayo Clinic income to determine maintenance. Peder testified that he worked part time at Mayo Clinic, that he did not plan to continue his work there after the dissolution concluded, and that the extra expenses of the proceedings necessitated temporary additional income. The district court, finding Peder's testimony regarding the Mayo Clinic income credible, determined that it was not the marital standard of living for Peder to work two jobs. And as the district court is in the best position to judge the credibility of the evidence and testimony, we defer to the court's determination. *See In re Welfare of A.D.*, 535 N.W.2d at 648.

However, in considering Peder's monthly expenses, the court failed to adequately explain how it calculated his budget when assessing maintenance.[13] The decree simply states, "Husband's reasonable monthly expenses are $41,000," which includes household

---

[13] Nor does it explain why Laura's expenses failed to include essential needs such as health and dental insurance.

expenses and Laura's maintenance award. In addition, the court determined that the $41,000 is inclusive of $7,000 for the children's college tuition. But under Minnesota law, the district court cannot consider the needs of the adult children when determining spousal maintenance. *Musielewicz v. Musielewicz*, 400 N.W.2d 100, 103 (Minn. App. 1987), *rev. denied* (Minn. Mar. 25, 1987).

From the exhibit submitted at trial of each party's net cash flow, and updated with the accurate amount of spousal maintenance, each party is assigned a significantly different income. Peder's monthly income equals $26,685.83 whereas Laura's amounts to $14,849.50. Without a clearer understanding of Peder's expenses, minus consideration of the adult children's college tuition costs, and given possible alterations in the underlying property division, we are unable to evaluate Laura's spousal maintenance award.

We remand this issue back to the district court for further review to determine spousal maintenance. We afford the district court discretion to reopen the record so that it may be presented with information necessary to provide a baseline of its considerations for the award, with the caveat that, for effective review in case of future appeal, we need a thorough record regarding both parties' expenses. *See Maschoff v. Leiding*, 696 N.W.2d 834, 840 (Minn. App. 2005) (noting importance of identifying baseline circumstances in stipulated dissolution judgments). This not only ensures an accurate finding of a spousal maintenance award but also that there is a reliable factual foundation in the event future modification is requested by either party. *See Sinda v. Sinda*, 949 N.W.2d 170, 177 (Minn. App. 2020) ("In maintenance-modification proceedings, particularized findings are necessary to show that relevant statutory factors have been considered.") (quotation

30

omitted). Because we remand the district court's award of spousal maintenance for further analysis, we decline to consider the rest of Laura's challenges on this issue.

**III.    The district court did not err in determining attorney fees for each party.**

Both parties challenge the district court's ruling on their requests for attorney fees. Laura argues the district court erred by denying her request for need-based attorney fees while Peder contends that the district court abused its discretion because it only awarded Peder $990 in conduct-based fees, which "does not reflect the substantial findings made by the Court regarding [Laura's] conduct."

Attorney fees in a family-law matter may be need- or conduct-based. Minn. Stat. § 518.14 (2024). We review a district court's decision regarding both types of attorney fees for an abuse of discretion. *Backman v. Backman*, 990 N.W.2d 478, 489 (Minn. App. 2023) (need-based); *Madden v. Madden*, 923 N.W.2d 688, 702-03 (Minn. App. 2019) (conduct-based).

*Need-Based Fees*

A district court "shall" award attorney fees to a party to enable them to continue on in the proceedings if the court finds the following factors:

> (1) that the fees are necessary for the good faith assertion of the party's rights in the proceedings and will not contribute unnecessarily to the length and expense of the proceedings;
> (2) that the party from whom fees . . . are sought has the means to pay them; and
> (3) that the party to whom fees . . . are awarded does not have the means to pay them.

Minn. Stat. § 518.14, subd. 1.  A district court may consider a party's property award in assessing need for fees.  *See Schallinger v. Schallinger*, 699 N.W.2d 15, 24 (Minn. App. 2005) (affirming denial of need-based fees when party paid fees in part with "advance marital fund distribution"), *rev. denied* (Minn. Sept. 28, 2005); *cf. Beck v. Kaplan*, 566 N.W.2d 723, 727 (Minn. 1997) (affirming award of need-based fees based on finding that requesting party would have to "deplete 'the limited capital assets available to her for her retirement'" to pay fees).  A district court's determination regarding a party's ability to pay fees is a factual finding that we review for clear error.  *Muschik v. Conner-Muschik*, 920 N.W.2d 215, 225 (Minn. App. 2018).

The district court denied Laura's request for need-based fees, finding that Peder's ability to pay the fees is "unclear at best" and that he has "substantial expenses to pay in terms of the parties' debts and fixed expenses."  The court found that Peder's ability to pay any need-based fees is limited and that Laura "already used significant portions of the marital estate to pay her attorneys and has received $10,000 per month in temporary maintenance" and that she has failed "and even refused to explain where her money goes each month."

Though it appears there was error by the district court in assigning some of the marital property, this would not alter Peder's income or the court's findings that Laura receives a monthly maintenance amount.  In fact, by remanding the above issues, Laura's equalizer payment will be reduced, freeing more funds for her expenses and attorney fees.  Therefore, we affirm the district court's denial of need-based fees.

***Conduct-Based Fees***

A district court "may" award additional conduct-based fees "against a party who unreasonably contributes to the length or expense of the proceeding." Minn. Stat. § 518.14, subd. 1a. Conduct-based fees may be based on a party's pursuit of "frivolous or bad-faith claims." *Baertsch v. Baertsch*, 886 N.W.2d 235, 239 (Minn. App. 2016). If a party takes positions that are "duplicitous and disingenuous" and further delays litigation and increases the expense of the proceedings, then an award of conduct-based attorney fees is appropriate. *Redmond v. Redmond*, 594 N.W.2d 272, 276 (Minn. App. 1999). A finding of bad faith is not required for an award of conduct-based attorney fees. *Geske v. Marcolina*, 624 N.W.2d 813, 818-19 (Minn. App. 2001).

Here, the district court made ample findings on Laura's delay of the proceedings and her frivolous claims. It found that she delayed the sale of the Oklahoma property for two years of the proceeding and did not cooperate with the sale. The district court also noted that she had not slept in the marital home since 2015 but still demanded a walk through after the dissolution began and then took valuable items from the home, dragged mud through the home, and left a sex toy on the counter after she left. Based on Laura's conduct, the district court found it appropriate to award Peder $990 in conduct-based attorney fees. Because the district court has discretion regarding whether to award Peder fees, and, if so, in what amount, and because the court's findings are supported by the record, we discern no abuse of discretion in the district court's award.

In sum, we affirm part of the district court's calculation of marital property, namely the valuation of Peder's business, assigning the TTCU mortgage debt to Laura as marital

33

property, the $55,000 in dissipated funds, and the forced sale and valuation of the Florida property.  We also affirm the court's refusal to consider Peder's Mayo Clinic income in determining spousal maintenance and the court's order regarding both parties' request for attorney fees.  We reverse and remand the remaining marital property challenges, including double-counting Laura's BOA account opened after the valuation date, granting Peder credit for the tax debt for 2022 and 2023 while also ordering Laura to amend her tax filings for those years, failing to account for Peder's bonus and his property tax responsibility for the Oklahoma property, the $50,000 and Porsche payment assigned as dissipated funds, and the characterization of the 2019 construction loan as nonmarital debt.  We also reverse and remand the district court's spousal-maintenance award for additional findings on Peder's expenses and reexamination of the award in light of these findings.  On remand the district court shall have discretion to reopen the record, and to make whatever adjustments in its rulings it deems necessary to equitably resolve the case.

**Affirmed in part, reversed in part, and remanded.**